Navarro A. HAMMOND, Appellant,

v.

UNITED STATES, Appellee.

Chester C. Wright, Appellant,

v.

United States, Appellee.

Nos. 97–CF–624, 97–CF–791.

District of Columbia Court of Appeals.

Argued June 24, 2003.
Decided Aug. 11, 2005.

Matthew J. Perry, with whom Jeffrey T. Green, Washington, DC, appointed by the court, was on the brief, for appellant Hammond.

Brenda C. Wagner, Washington, DC, appointed by the court, for appellant Wright.

David B. Goodhand, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Roy W. McLeese III, Assistant United States Attorneys, were on the brief, for appellee.

Before: FARRELL and WAGNER, Associate Judges, and STEADMAN, Senior Judge.[*]

WAGNER, Associate Judge:

Appellants, Navarro A. Hammond and Chester C. Wright, were indicted on charges of conspiracy to commit first-degree murder while armed (D.C.Code §§ 22–105a,[1] –2401 [2](1989)), first-degree murder while armed (premeditated) (D.C.Code §§ 22–2401, –3202 [3] (1989)), obstruction of justice (D.C.Code § 22–722(a)(1)(1989)),[4] first-degree murder while armed (felony murder predicated upon obstruction of justice) (D.C.Code §§ 22–502,[5] –722(a)(1), –3202 (1989)), and assault with intent to commit obstruction of justice while armed (D.C.Code §§ 22–502, –722(a)(1)), all arising out of the murder of Ronald Richardson, a District of Columbia Corrections Officer. Wright was also charged with possession of a firearm during the commission of a crime of violence (PFCV) and carrying a pistol without a license (CPWL) (D.C.Code §§ 22–3204(a),

---

[*] Judge Wagner was Chief Judge of the court at the time of argument. Her status changed to Associate Judge on August 6, 2005. Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

1. Recodified at D.C.Code § 22–1805a (2001).

2. Recodified at D.C.Code § 22–2101 (2001).

3. Recodified at D.C.Code § 22–4502 (2001).

4. Recodified at D.C.Code § 22–722 (2001).

5. Recodified at D.C.Code § 22–402 (2001).

(b) (1992)).[6] Following a jury trial, both appellants were convicted as charged except that Wright was found not guilty of CPWL. Hammond's principal argument on appeal is that reversal and dismissal of the indictment is required because he was denied his constitutional right to a speedy trial. He also argues that the trial court erred in failing to sever his case from Wright's case and in admitting certain statements made by a co-defendant, Bradley Sweet, who was tried separately. Wright adopts Hammond's speedy trial argument. Further, he argues: (1) that the trial court erred in admitting certain hearsay statements and in excluding others; (2) that he was prejudiced by other crimes evidence and fear expressed by the witnesses; (3) that the evidence was insufficient to convict him; (4) that he was denied due process because the prosecutor pursued conflicting theories against him and a co-defendant in a separate trial; and (5) that all of the offenses of his conviction merge. After carefully considering all of the factors relevant to a speedy trial analysis, we conclude that, in spite of the lengthy delay in this case, appellants were not deprived of their constitutional right to a speedy trial. Finding no other reversible error, we affirm appellants' convictions. We remand to the trial court with instructions to vacate the merged offenses consistent with this opinion and for consideration of Wright's unresolved motion filed pursuant to D.C.Code § 23–110 (1989).

## I. Factual and Procedural Background

### A. *Procedural History*

Ronald Richardson, a corrections officer, was scheduled to testify against Michael Page in a kidnaping trial on October 7, 1991. That morning, as Richardson left his home at 5739 Blaine Street, N.E. to go to court, he was shot and killed as he stood next to the family car. Hammond, Wright, Terrence (Terry) Pleasant, and Bradley Sweet, who were associates of Page, were indicted on June 29, 1992 on charges related to Richardson's murder. Both Hammond and Wright filed motions to sever their cases from that of their co-defendants, which the trial court (Judge Cheryl M. Long) denied. The government voluntarily severed Sweet's case for trial, and the court decided to proceed first with Sweet's trial, scheduling it for February 19, 1993. Neither Hammond nor Wright objected. The court scheduled trial for Hammond, Wright and Pleasant for March 5, 1993.

Sweet's trial was continued, and on March 5, 1993 counsel for co-defendant Pleasant requested a June trial date "on behalf of defense counsel." The government represented that Sweet's trial would not be completed by that time and that defense counsel would not have had an opportunity to obtain and review transcripts and documents from Sweet's trial with only a week between trials. Neither Hammond nor Wright objected to this representation. The court set a new trial date of June 18, 1993. At a status conference held on June 2, 1993, a new attorney was appointed for Wright, and the court considered a new trial date. The government noted that in addition to Wright's change of counsel, there was a possibility that the Sweet trial might be continued and that defense counsel had said that they wanted the "benefit of hearing ... the evidence [from the Sweet trial] first before going to trial." Again, neither Wright nor Hammond objected to this representation, and a new trial date was set for November 1, 1993. However, this trial date was continued again, first to Novem-

---

**6.** Recodified at D.C.Code § 22–4504(a) (2001).

ber 17, 1993, apparently because Sweet's trial had not yet ended. On November 17, 1993, the court was in trial. At a status hearing on November 23, 1993, the court (Judge Long) announced that the Sweet trial had just ended on Friday, November 19, 1993.[7]

The government then informed the court that the Michael Page case would be tried separately and suggested setting Page's trial in early January and trials for the remaining co-defendants in February or March. However, Hammond's counsel indicated that he had a very complicated, multi-defendant death penalty trial in the District Court that was expected to last four months. After considering the scheduling conflicts, the trial court set the Page trial for January 19, 1994 and appellants' trial for May 9, 1994. During this hearing, Wright's counsel asserted his speedy trial rights. The government noted that Mr. Wright was serving a sentence in another case.

At a status conference on April 14, 1994, co-counsel for Hammond requested a continuance of the May 9th trial date because of the anticipated delivery date for her child and the projected six weeks for the trial of this case. The prosecutor stated that the government was anxious to try the case, and counsel for appellant Wright also stated that he was prepared and anxious to proceed; however, he acknowledged that Wright was serving a sentence in another case. Since appellant Hammond had co-counsel who was expected to try the case, the trial court (Judge Colleen Kollar–Kotelly) denied the request to continue the May 9th trial date. The court vacated the June 6th back-up trial date,

and set a back-up trial date for September 23, 1994.

On May 9, 1994, the assigned prosecutor was in trial, and therefore requested a continuance. Although a back-up date of September 23, 1994 had been set, the lead counsel for Hammond was expected to be in trial in the federal court for four to five weeks at that time. Hammond's counsel said that he had no objection to an October or November trial date. Counsel for appellant Wright had a five co-defendant trial starting on September 28, 1994 that was expected to last for two weeks. Co-counsel for Hammond indicated that it would be lead counsel's "preference" to proceed in October, and counsel for Wright stated that any date in October was agreeable to him. The court then scheduled the trial for October 17, 1994.

On October 17, 1994, Pleasant's counsel moved for a continuance because he was in a trial that was expected to take four weeks to complete. Finding it difficult to secure a date convenient for all parties, the trial court suggested proceeding with the trials of the remaining defendants and continuing only Pleasant's case. Not having anticipated this possibility, the prosecutor stated that he was not ready to proceed in the other two cases. There was a suggestion that the case be continued for two weeks. Hammond's counsel stated that he agreed to a continuance of three to seven days, but that a longer continuance would present difficulties for him. Wright's counsel stated that he was prepared to go forward that day, and he moved to dismiss if the government was not prepared to proceed. The trial court denied Wright's motion to dismiss and continued the case

7. The court takes judicial notice that November 19, 1993 was a Friday. *See State v. Smith,* 679 S.W.2d 899, 902 (Mo.App.1984) ("[A]ppellate courts may take judicial notice of calendars and dates on which a particular

day of the week fell."); *Prestige Homes, Inc. v. Legouffe,* 658 P.2d 850, 853 (Colo.1983) (noting that calendar days and dates are subject to judicial notice) (citing *Sierra Mining Co. v. Lucero,* 118 Colo. 180, 194 P.2d 302 (1948)).

for one week until October 24, 1994. On October 24, 1994, the prosecutor was ill, and the case was continued until the next day.

On October 25, 1994, the trial court (Judge Kollar–Kotelly) ruled inadmissible portions of certain statements implicating Hammond, Wright and Pleasant in the crimes charged.[8] The government filed a notice of appeal and certification that "the evidence at issue is substantial proof of the charged offenses and that the appeal is not taken for purposes of delay." On November 7, 1994, the government filed a motion to expedite its interlocutory appeal, which was granted on January 25, 1995. The record was completed on March 16, 1995. On September 5, 1995, this court issued an order requiring the government to file its brief in forty days and Hammond and Wright to file their briefs within thirty days. The government filed its brief on October 16, 1995. Hammond's brief was filed *nunc pro tunc* on November 24, 1995. Wright was directed to file his brief at that time, but Wright did not file his brief until February 20, 1996. The government filed its reply brief on April 5, 1996. The case was argued in the Court of Appeals on April 22, 1996.

On August 15, 1996, this court issued an opinion reversing the decision of the trial court. *See Hammond I, supra* note 8, 681 A.2d at 1146. This court determined that the appeal was properly before the court and that the trial court had "misconstrued *Williamson* [*v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)] as creating a *per se* rule barring admission, under the hearsay exception for declarations against penal interest, of any statement which refers to the criminal conduct of a third party." *Id.* at 1141. The court therefore remanded the case to the trial court to determine, in conformity with *Williamson*, "whether each of the statements, and each of the incriminating references to one or more third parties was truly self-inculpatory as to the declarant." *Id.* at 1146. This court's mandate was issued on September 9, 1996 and is noted as received in Superior Court on September 26, 1996. A status hearing was held in the trial court before Judge Truman Morrison on October 11, 1996. The government asked for two weeks to finalize plea offers, and neither Wright nor Hammond objected. Therefore, the case was continued until October 24, 1996. On October 24, 1996, the case was continued until No-

8. These rulings on the redaction and admissibility of the statements were as follows:

1. Sweet's statement to a police detective that he was a 'hit man' and that he had committed murder before was admitted, but the portion of Sweet's statement which indicated that he was a hit man for Hammond was redacted.
2. Sweet's statement to a civilian witness that he shot Richardson in the body with a .380 caliber handgun was admitted, but the portion of Sweet's statement which declared that Wright also shot Richardson in the head was redacted.
3. Pleasant's statement to his cousin that he drove the shooters in a van to the scene of the murder was admitted, but the following portions of the statement were redacted: a) that Sweet and Wright

were the shooters whom Pleasant drove to the scene; b) that Pleasant waited for Sweet and Wright while the two men committed the murder; c) that Pleasant drove Sweet and Wright away from the scene; and d) that Sweet and Wright should 'take their beef' because Pleasant wasn't the trigger man.
4. The word 'we' was redacted from Pleasant's statement to his cousin that 'we got one around your way.'
5. The portions of Sweet's statement to a civilian witness which described his own role in Richardson's murder were admitted, but the portions referring to the conduct of Wright and Pleasant were redacted.

*United States v. Hammond (Hammond I)*, 681 A.2d 1140, 1142 (D.C.1996).

vember 1, 1996 at the request of the parties. At the status hearing on November 1, 1996, both Hammond and Wright asserted their right to a speedy trial. A trial date was set for January 6, 1997 when the case finally proceeded to trial.

### B. *Government's Trial Evidence*

Roxanne Richardson, the victim's wife, testified that on the morning of October 7, 1991, she was at home with her husband, Ronald Richardson, their two daughters, their son, and granddaughter at 5739 Blaine Street, N.E. before Mr. Richardson left for court. She said that he usually drove a Pinto. Mr. Richardson was going to court to testify in a kidnaping case against Michael Page.

Ms. Richardson's daughter, Loncene Wright, testified that she saw her father dressed in a suit before he left for court that morning. After he left, she went back upstairs, and then heard gunshots. She looked out of her second floor bedroom window and saw "three guys" in the street. The men left in a burgundy Dodge Caravan, after two of them entered on the passenger side and another, who had a gun, entered on the driver's side.

Kimberly Hayes, who lived in the neighborhood, testified that at approximately 7:30 a.m. on October 7, 1991, Mr. Richardson was on his porch. She saw two men "jump" out of a burgundy colored Caravan and shoot Richardson once or twice. She said that after one of the two men walked to the passenger side of the van, the driver "walked up" and shot Richardson in the head "several times." The medical evidence confirmed that three shots entered and exited Richardson's head. Hayes identified the driver of the van as Terry Pleasant. Although she had seen only two people, she testified that she did not have a view of the other side of the van.

Michelle Watson testified that she had known Navarro (Tony) Hammond since 1988 and that he had introduced her to Terry Pleasant, Sweet and Chester ("Man") Wright. She stated that in 1991, Terry Pleasant drove a burgundy Dodge Caravan that had a problem with its transmission. On October 5, 1991, the Saturday before Richardson's murder, Ms. Watson and her brother Kevin Watson went to Pleasant's home; that Wright and Pleasant, who was talking on the telephone, were there. She went down the hill and got into Hammond's car. After a while, Pleasant, who appeared to be jolly, joined them in the car, said "go it," and handed Hammond a piece of paper. After everyone left the car, Hammond asked Ms. Watson to "check out" something, and he handed her the piece of paper that Pleasant had given him. The paper had on it an address at 57th and Blaine Street and a license plate number. Ms. Watson recalled that at some point she had heard Pleasant say to Hammond, "Mike said handle that."

Using the burgundy Caravan, Ms. Watson "checked out" the information and found that the license plate at that address belonged to a green Ford Pinto. Later, when Ms. Watson heard about Richardson's murder, she realized that he was connected to the address that she had checked. Soon after the murder, she encountered Sweet, Terry Pleasant, Hammond, and her brother, Kevin, and Sweet said that he had shot the man to the body, and "Man" (Wright) shot him to the head. Hammond also told her that he was around by the school when the murder occurred, saw Terry Pleasant, Wright, and Sweet, and that "when he saw Bradley [Sweet] he knew the job would get done." Ms. Watson testified that while having breakfast at Barnside Restaurant, Wright told her "that he shot the man to the head

and Bradley [Sweet] shot him to the body."

Kevin Watson, Ms. Watson's brother, testified that on October 5, 1991, he and his sister went to the home of Terry Pleasant. He stated that his sister got in the car with Hammond. Mr. Watson began working on the transmission of the Caravan while Wright and another person stood nearby. Wright was "talking about giving somebody, you know, all head shots ...." [9] Watson also recalled that Hammond had approached his sister, handed her a piece of paper and asked her to check out something "before Monday," an address near 58th and Blaine Streets. According to Mr. Watson, he was in the company of Sweet, Terry Pleasant and Hammond later when Sweet said "he shot the bamma to the body ... Man shot him, stood over him, shot him in the head." He also indicated that Hammond referred to the murder as "my work," and that "when he [Hammond] saw [Sweet] come over the hill with Man he knew everything was taken care of because he could count on [Sweet] taking care of it."

Eric Pleasant (Eric), Terry Pleasant's cousin, testified that he was a former Pentagon employee with a top secret clearance. He said that a few weeks before the Richardson murder, Sweet, Wright, Terry Pleasant, and two others were "planning" to "kill someone." A few days before the murder, he heard "basically the same conversation." Shortly after the murder, Eric went to Terry Pleasant's home, and Terry said, "we got one around your way." Terry Pleasant confirmed that this statement related to the Richardson murder and indicated that it had been done "[f]or Mike," which he repeated a few days later. Eric testified that in a conversation with Wright a few months after the murder, Wright said "Bradley hit him to the body and I hit

him to the head." Eric Pleasant also stated that Terry Pleasant told him that the burgundy Caravan had to be destroyed. The van was eventually found, painted blue and burned. The vehicle had a problem with the transmission.

Detective Rita McCoy–Brown testified that Sweet admitted that he was a "hit man" and that "he had done numerous murders." Wright's neighbor, Dawn Brown, testified that she overheard a telephone conversation in which Wright stated, "We did that to the c.o." Brown, who was twelve at the time, asked someone what a "c.o." was, and learned that it meant corrections officer.

## II. Speedy Trial Claim

 Hammond argues that the trial court erred in denying his motion to dismiss the indictment based on the claim that he was denied his right to a speedy trial. He contends that the delay of fifty-four months between indictment and trial presumptively violated his speedy trial rights and that he was prejudiced thereby. While the government concedes that the length of the delay gives *prima facie* merit to the speedy trial claim, it contends that considering the reasons for the delay, including a successful interlocutory appeal by the government, the complexity of the case, and the lack of prejudice to Hammond, who was incarcerated on other charges during much of this period, the balance of the factors relevant to consideration of Hammond's claim supports denial of his motion to dismiss on speedy trial grounds.

Wright adopted Hammond's speedy trial argument without elaboration. The government contends that Wright's general adoption of Hammond's argument is insufficient to comply with the requirement of

---

**9.** An objection was made, and then with- drawn, after this testimony.

D.C.App. R. 28(a) and raise the issue on appeal. It contends that the speedy trial inquiry is fact-specific and that the facts supporting Hammond's claim do not necessarily support Wright's claim. Further, the government contends that, in any event, since Hammond's claim fails, Wright's claim must fail also.

### A. General Legal Principles

■■■ "Manifestly, the right to a speedy trial is a fundamental constitutional right." *Cates v. United States,* 379 A.2d 968, 970 (D.C.1977) (footnote omitted). To analyze a claim that the right to a speedy trial has been denied, we use the familiar four-pronged balancing test established by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Under the *Barker* analysis, we consider the following factors: (1) the length of the delay; (2) the reasons for the delay; (3) the assertion of the right by the defense; and (4) any resulting prejudice to the accused. *Id.* at 521, 530, 92 S.Ct. 2182. "These factors are related and must be considered together with other relevant circumstances in 'a difficult and sensitive balancing process.'" *Graves v. United States,* 490 A.2d 1086, 1091 (D.C.1984) (quoting *Barker,* 407 U.S. at 533, 92 S.Ct. 2182), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). The conduct of the balancing process "falls in the first instance to the trial court." *Id.* In reviewing the trial court's ruling, we are bound by its factual findings, "unless they are plainly wrong or without evidence to support them." *Id.* (citing D.C.Code § 17–305(a) (other citations omitted)). We consider *de novo* the trial court's legal conclusions and will reverse its decision for errors of law. *See id.* Applying these principles, we consider Hammond's speedy trial claim.

### 1. Length of the Delay

■■■ "Delay is measured from the time the individual is formally accused." *Graves, supra,* 490 A.2d at 1091 (citing *United States v. MacDonald,* 456 U.S. 1, 6–7, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982) (other citation omitted)). "A delay of a year or more between arrest and trial gives prima facie merit to a claim that a deprivation of an accused's speedy trial rights has occurred." *Tribble v. United States,* 447 A.2d 766, 768 (D.C.1982) (citing *Branch v. United States,* 372 A.2d 998, 1000 (D.C.1977) (citations omitted)). After a delay of one year, the burden shifts to the government to justify it. *Cates, supra,* 379 A.2d at 970 (citation omitted). In this case, both appellants were indicted on June 29, 1992, and their jury trial did not commence until January 7, 1997, about fifty-four months later. The government concedes, as it must, that the length of the delay means that there is *prima facie* merit to appellants' speedy trial claims and that the burden then shifts to the government to justify the delay.

### 2. Reasons for the Delay

■■■ Different weights are assigned to the various categories of reasons for delay. *Barker, supra,* 407 U.S. at 531, 92 S.Ct. 2182. Generally, these categories distinguish between delays that are neutral, justified and significant. *See Graves, supra,* 490 A.2d at 1092. In *Barker, supra,* the Supreme Court instructed concerning the weighing of the types of delay:

A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government

rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

407 U.S. at 531, 92 S.Ct. 2182. While adhering to the foregoing general framework, "[w]e have, in effect, created an intermediate category of 'significant' delay for government actions deemed less culpable than deliberate foot-dragging to gain tactical advantage but more culpable than the neutral category exemplified by failure to advance trial dates due to court congestion." *Graves*, 490 A.2d at 1092 (citing *Day v. United States*, 390 A.2d 957, 968 (D.C.1978)). Our cases have sometimes identified neutral delays as "neutral plus" or "neutral minus" to indicate that the delay is being weighed more or less heavily against the government. *See id.* at 1092, 1098 n. 12; *Turner v. United States*, 622 A.2d 667, 675, 677 n. 14 (D.C.1993). For example, a delay resulting from the government's request for a continuance because it could not locate a key witness, without a satisfactory explanation, has been characterized as "neutral plus" delay, while delay occasioned by institutional difficulties of scheduling a block of time when the prosecutor and all counsel could be available has been designated "neutral minus." *Graves*, 490 A.2d at 1093. Delay that is attributable to a valid reason is justifiable delay and is not weighed against the government at all.[10] *See id.* at 1092, 1098 n. 12. Delay resulting from the government's deliberate attempts to create delay and hamper the defense is weighed heavily against the government. *See id.* at 1092. Governmental delay that is "less culpable than deliberate foot-dragging" but more culpable than neutral delays related to court congestion is considered signifi-

cant and is weighed "somewhat more heavily than neutral delay." *See id.* at 1092, 1093. Generally, delays occurring after the assertion of speedy trial rights is accorded greater weight than those that occur before. *Id.* at 1094.

We evaluate Hammond's speedy trial claims applying these general principles. The procedural history is set forth in some detail in Section I and will be repeated in this section only as necessary for an understanding of our analysis. In the appendix to this opinion, we have summarized our conclusions.

*a. June 29, 1992 to October 29, 1992*— The indictment was filed on June 29, 1992, and Hammond's arraignment was held on July 13, 1992. The first trial date was set for October 29, 1992 with intervening status dates. Wright, who was in jail in North Carolina at the time, had to be brought in by writ and was not arraigned until January 5, 1993. Appellants concede that the four months between indictment and the first trial date are considered institutional delay, which is not weighed heavily against the government. *See, e.g., Tribble, supra,* 447 A.2d at 769 ("[T]he prosecution cannot be strongly faulted for the inevitable delays which are inherent in the proper and deliberate functioning of the judicial system.") (citation and internal quotations omitted).

*b. October 30, 1992 to November 23, 1993*—Appellants argue that the delay between the October 29th trial date and the second scheduled trial date of March 5, 1993, occasioned by problems with co-defendants' counsel, and a third trial date of June 18, 1993 as a result of a continuance request by co-defendants Page and Pleas-

---

10. For example, the Supreme Court said that "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Barker, supra,* 407 U.S. at 531, 92 S.Ct. 2182.

"Where the government, however, fails to give a satisfactory explanation for the absence of its employees it has not justified such delay." *Graves, supra,* 490 A.2d at 1093 n. 9.

ant, should be charged to the government because it chose to join these cases. Further, they contend that the delay should be weighed significantly against the government. However, the record reflects that both Hammond and Wright acquiesced in the delay. Appellants wanted their cases severed from that of the co-defendants, and the government voluntarily severed Sweet's case. The trial court set Sweet's trial for February 19, 1993, and appellants' trial for March 5, 1993. On March 5, 1993, counsel for Page filed a motion to continue the trial in order to file motions related to other-crimes evidence and the admissibility of a letter concerning Hammond. Counsel for Hammond stated that he did not object to the continuance and that he wanted to resolve the motions pre-trial. Wright specifically waived any speedy trial rights at that point. There were representations that appellants wanted the Sweet trial completed in order to have the benefit of the transcripts and evidence from his trial in preparation for their own trial. The trial court set motions deadlines for March 26th, a date for the government's response on April 12th, a motions hearing for May 12th, and a trial date of June 18, 1993. At a status hearing on June 2, 1993, the trial date was continued until November 17, 1993 because Wright had changed counsel and there was a possibility that Sweet's trial would be continued. Again, neither Wright nor Hammond objected to the government's representation that it still wanted the Sweet case to go first to have the benefit of records from that case. Sweet's trial was not completed until November 19th, and a status hearing was held in this case the following Monday, November 23rd.

None of the foregoing delay falls into the category of significant delay attributable to the government. Much of the delay resulted from requests of the co-defendants for a continuance, the difficulties associated with scheduling, and the preference for having the Sweet trial go first. Appellants are correct that we have said that the government bears responsibility for delays occasioned by requests of co-defendants, since the government chooses to try defendants jointly. *See Ruffin v. United States,* 524 A.2d 685, 689–90 (D.C.1987) (citations omitted). However, we have also said that "in light of the policy considerations favoring joinder, this responsibility does not weigh heavily against the government." *Id.* at 689 (citing *Adams v. United States,* 466 A.2d 439, 444–45 (D.C.1983)). Moreover, where, as here, a defendant has acquiesced in the delay, the period will not be weighed heavily against the government. *See Tribble, supra,* 447 A.2d at 769; *see also Freeman v. United States,* 391 A.2d 239, 241 (D.C.1978) ("Acquiescence in delay by not objecting to it will result in minimal weight being accorded to that period.") (citation omitted). For these reasons, we consider the period discussed in this section to be "neutral" and not weighed heavily against the government.

*c. November 23, 1993 to May 9, 1994—* On November 23, 1993, Hammond was awaiting a verdict in a trial in federal court.[11] At a status hearing in this case on that date, the government sought to try co-defendant Page before the remaining defendants. The court was unavailable because it was already in trial in a preventive detention case, which would resume after Thanksgiving and require all of the following week to complete. Appellants' trial

---

11. According to Hammond's brief, his case in federal court had to proceed under the con-

straints of the Federal Speedy Trial Act.

could not be held in December or January because of its length,[12] two court training days and holidays in December, the unavailability of the judge after the 21st of December, and the unavailability of counsel for Pleasant on December 20th & 21st and all of January. The government suggested having the Page trial proceed in early January and the trials for the remaining defendants in late February or March. The court set the Page trial for January 19th to accommodate his counsel's schedule. The government proposed February 28th or March 7th for appellants' trial date. However, lead counsel for Hammond had a death penalty case set for February 7th which was expected to last for four months. The court offered April 11th, but Hammond's counsel was again unavailable. Ultimately, the parties agreed on a trial date of May 9th and a back-up trial date of June 6th.

 Hammond argues that all of the delay during this period should be chargeable to the government, although not weighed heavily, because the conflicts could have been avoided, and he had moved for severance in an effort to go to trial. Insofar as the trial could not be held in November and dates in December due to the court's involvement in another trial and court training days, the delay must be considered neutral. *See Turner, supra,* 622 A.2d at 676 (delay for "judge's attendance at a judicial conference is neutral delay"); *Graves, supra,* 490 A.2d at 1097 (Delay is considered neutral where the trial court is unavailable because of involvement in another trial.). The government bears responsibility for delay caused by its decision to sever and try the Page case first, which would ordinarily be charged as significant. *See Lemon v. United States,* 564 A.2d 1368, 1377 (D.C.

1989) (prosecutor's unavailability for trial significant and charged to government). However, Hammond and Wright did not object to this procedure, and therefore, may be said to have acquiesced in it by silence. Where a defendant acquiesces in the delay, the period will not be weighed heavily against the government. *See Tribble, supra,* 447 A.2d at 769; *see also Freeman, supra,* 391 A.2d at 241. Earlier trial dates could not be scheduled in large measure because of Hammond's counsel's schedule, as well as the schedules of the other defense lawyers. These factors would prevent weighing the delay heavily against the government. *See Turner, supra,* 622 A.2d at 677 (Delay resulting from government's unpreparedness, customarily chargeable as significant delay, where prolonged by defense counsel's scheduling difficulties is weighed less heavily than significant delay.). Scheduling conflicts of counsel and the court's docket prolonged the delay. This period should be treated, therefore, as "neutral plus" delay at best. *See id.* at 677 n. 19.

 *d. May 9, 1994 to October 17, 1994*—On May 9, 1994, the government requested a continuance because the prosecutor was in trial on another matter. Prosecutorial delay due to conflicting trial dates is considered significant delay. *See Lemon, supra,* 564 A.2d at 1377. Ordinarily, the delay during this period must be weighed against the government, but not as heavily as purposeful delay. *See Graves, supra,* 490 A.2d at 1092, 1093. In this case, the original back-up trial date, scheduled in June, was reset until September 23rd to accommodate Hammond's co-counsel's pregnancy and the unavailability of his other attorney. Because both of Hammond's attorneys and Pleasant's coun-

---

**12.** Page's trial was expected to take close to a month, and the trial of Hammond, Wright

and Pleasant was expected to last a month to six weeks.

sel had problems with the September date, the trial had to be set for October 17, 1994. Therefore, only one month of this period should be charged to the government.

■ *e. October 17, 1994 to October 24, 1994*—On October 17, 1994, Pleasant's counsel could not proceed because he was in trial in another case. Anticipating that a continuance would be granted, the prosecutor was not prepared to proceed with the remaining defendants' cases as the court suggested. Delays due to prosecutorial unpreparedness must be weighed as significant. *See Turner, supra,* 622 A.2d at 677 ("[T]he subsequent delay was caused by the prosecutor's unpreparedness and therefore is significant delay.").

■ *f. Continuance of October 24, 1994*—A one day continuance was granted on October 24, 1994 because of the prosecutor's illness. This period is justifiable delay which is not counted against the government. *Graves, supra,* 490 A.2d at 1093 (Delay caused by prosecutor's injury is justified and not counted against the government at all.); *see Turner, supra,* 622 A.2d at 677 (prosecutor's illness not weighed against the government).

■ *g. October 25, 1994 to September 26, 1996*—During this period, the government pursued an interlocutory appeal. Given the importance of appellate review to our system of justice, "reasonable appellate delay resulting from interlocutory appeals is considered justifiable in the speedy trial analysis." *Sell v. United States,* 525 A.2d 1017, 1021 (D.C.1987) (citing *United States v. Loud Hawk,* 474 U.S. 302, 316, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986)). The reasonableness of the delay is determined by evaluating the strength of the government's position on the appeal-

ed issue, the importance of the issue in the case, and the seriousness of the crimes. *Id.* at 1022 (citing *Loud Hawk, supra,* 474 U.S. at 316, 106 S.Ct. 648). However, if the government fails to take steps to expedite the appeal, unreasonable delay is weighed significantly against the government. *See id.* (citing *Graves,* 490 A.2d at 1096). Applying these factors, we evaluate the twenty-three months taken to complete the government's interlocutory appeal.

Appellants concede, as they must, the seriousness of the crimes charged. That the issues pursued by the government on appeal had merit is supported by the fact that it prevailed on appeal.[13] *See Loud Hawk, supra,* 474 U.S. at 316, 106 S.Ct. 648 ("[R]eversals by the Court of Appeals are prima facie evidence of the reasonableness of the Government's action."). Hammond argues that the statements were not substantial proof of the government's case because Pleasant was convicted without them, and the statements either were not used at appellants' trial or admitted in conformity with Judge Kollar–Kotelly's prior ruling. However, as the government points out, that the statements were not needed to secure Pleasant's conviction cannot measure validly whether the statements were substantial proof against Hammond and Wright. Other evidence was introduced against Pleasant, including eyewitness testimony that he participated in the murder and incriminating letters that he wrote. Such evidence was not available against Hammond and Wright. Therefore, we cannot conclude, as appellants contend, that the successful prosecution of Pleasant without the statements at issue on appeal undermines the validity of the government's certification in support of the interlocutory appeal.

13. *See Hammond I, supra* note 8, 681 A.2d 1140 (reversing the trial court's decision and remanding for further proceedings).

The government used some of the statements that were substantial proof of appellants' involvement in the crime, including, *e.g.,* Terry Pleasant's statement, "we got one around your way"; Sweet's statements implicating Wright as shooting Richardson in the head; and Hammond's statements placing Wright at the scene. We are not persuaded that the government's decision post-appeal to accede to the redaction previously ordered for one of the several statements involved on appeal leads to the conclusion that the former prosecutor was unreasonable in pursuing the appeal. The statements were critical evidence, and as this court found in *Hammond I* in determining admissibility, the trial court had misconstrued the requisite standard. *Id., supra* note 8, 681 A.2d at 1141. Thus, the government's position on appeal was shown to be strong. *See Sell, supra,* 525 A.2d at 1022 (citation omitted).

Nevertheless, appellants argue that the appeal was not taken in good faith because the prosecutor's decision to appeal came shortly after the trial court denied his request for a continuance. Although the trial court (Judge Kollar–Kotelly) initially questioned the government's motives, it did not find that the appeal was taken in bad faith. Similarly, the trial judge (Judge Harold L. Cushenberry) declined to make such a finding. Hammond has provided no reason to disturb the trial court's findings in this regard. *See Graves, supra,* 490 A.2d at 1091 (citations omitted).

Appellants argue that although the government moved to expedite the appeal, it caused delay by failing to seek a briefing

schedule after the record was completed and by filing its brief in forty days as permitted by the court's scheduling order, rather than the twenty days suggested for expedited appeals in *Graves, supra,* 490 A.2d at 1096 ("[F]or an expedited appeal, . . . the government should normally be expected to file [its brief] in about 20 days."). Here, the government moved to expedite the appeal, secured the record and transcripts promptly, and complied with the court's briefing schedule.[14] The prosecutor's responsibility extends beyond filing a motion to expedite the appeal; it "contemplates that the prosecution is to take affirmative steps to ensure that bureaucratic delays are minimized." *Id.* at 1096 n. 11. Therefore, there may be other steps by which the government could have accelerated the process, such as pressing the court to issue the briefing order earlier or filing its brief sooner than required. Delay that can be avoided by expediting the appeal weighs significantly against the government. *Sell, supra,* 525 A.2d at 1022 (citations omitted). In this case, however, there are other factors in assessing this period that must be taken into account.

Although the prosecutor is primarily responsible, "*all* those involved in the appellate process are to take responsibility to see that pre-trial appeals receive priority . . . ." *Graves, supra,* 490 A.2d at 1096 (emphasis added). Failing to hold the defendant accountable for his failure to move the appeal along would create a perverse incentive for defendants to delay appeals in hopes of strengthening their speedy trial claims.[15] Here, appellants have not

---

**14.** The record was completed on March 16, 1995, but the briefing order was not entered until September 5, 1995, requiring the government's brief to be filed on October 16, 1995.

**15.** *See Graves, supra,* 490 A.2d at 1101 (quoting *Day, supra,* 390 A.2d at 970 (overruled on other grounds)) ("If we do not hold [the defendant] responsible [for pressing expedition on appeal], we will in effect be encouraging him to hold back during the appeal period, take his chances on eventual acquittal in the

identified any steps that they took to assert any interest in expediting the appeal. Indeed, Hammond's brief was filed almost ten days late, and Wright's brief was filed some three months late. Considering all of the circumstances, the nearly six month period from March 16, 1995 to September 5, 1995 cannot be considered significant delay against the government, but should be designated "neutral plus."

The remainder of the appeal period must be regarded as "neutral." The government moved to expedite the appeal and adhered to the court's schedule. The time for completing the appeal process is " 'unavoidable' given court congestion, not unreasonable and therefore not to be regarded as 'significant.' " *Gayden v. United States*, 584 A.2d 578, 584 (D.C.1990) (citation omitted), *cert. denied*, 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991). In *Gayden*, this court determined that an eighteen month lapse between the government's notice of appeal and denial of the government's petition for rehearing *en banc* was "neutral delay" where the government moved to expedite the appeal, the appeal was "far from frivolous" and suppression of the defendant's confession was of substantial importance to a serious second-degree murder while armed case. *Id.* at 584 (citing *Loud Hawk, supra,* 474 U.S. at 315, 106 S.Ct. 648). Similarly, in this case, consideration of these same relevant factors as previously outlined leads to a similar conclusion that the delay is "neutral," except as otherwise indicated.

*h. September 26, 1996 to January 6, 1997*—Once the mandate was received in the trial court on September 26, 1996, a status hearing was held on October 11, 1996. The government requested a brief continuance to finalize plea offers for appellants; neither objected, and the case

was continued until October 25, 1996. A status hearing was held on November 1, 1996 where the parties reported on plea negotiations and considered a trial date. Appellants requested an early trial date, and the court set the trial date for January 6, 1997. A delay of this length before trial is not unreasonable and should be considered neutral. *See Gayden, supra,* 584 A.2d at 584 (Four and three quarters months between completion of interlocutory appeal and trial date is not unreasonable and designated neutral).

*i. Summary of Reasons for the Delay*—Of the approximately fifty-four months required for the interlocutory appeal, approximately one month is "significant," eleven and one-half months are "neutral plus," sixteen and one-half months are "neutral," approximately eight months are "neutral minus," and sixteen months and one day are justified as summarized in the appendix to this opinion. The greater part of the time is either "neutral" or justified.

### 3. Assertion of the Right

"While invocation of this important [speedy trial] right is not dependent on the uttering of court-ordained incantations, we have made it clear that the credibility of an accused's assertion of the right is enhanced by such a direct statement." *Graves, supra,* 490 A.2d at 1098 (citing *Bethea v. United States,* 395 A.2d 787, 792 (D.C.1978)) (other citation omitted). In considering this factor in the speedy trial analysis, we take into account whether the assertion of the right is merely *pro forma,* or whether the defendant really seeks a prompt trial. *Id.* (citation omitted). Hammond contends that he asserted his speedy trial right by requesting severance, com-

hope that the government's case will become stale during the hiatus, and then have a second opportunity for dismissal—for lack of a speedy trial.").

menting about the delay and filing a motion for speedy trial in December 1995. Upon examination of each of these factors, we conclude that Hammond's delayed assertion of the right was, for the most part, *pro forma*, and undercut by his own preference for trial after his co-defendant.

Hammond's severance motion proceeded on several grounds, but did not include any claim that it was sought in order to secure a speedy trial. Thus, it does not appear that the severance motions requested immediate trial in the alternative. Absent a clear indication that severance was sought for speedy trial purposes, we will not infer it in these circumstances. *See Graves, supra*, 490 A.2d at 1098 (suggesting that a direct statement provides the clearest evidence of assertion of the right). Even if Hammond's severance motion could be read as an assertion of the right, his subsequent actions negate any inference that he was seeking a prompt trial. Twice, Hammond expressed the preference not to be tried until after Sweet's trial was completed. Once, he requested a continuance, and once, he affirmatively disclaimed any speedy trial concerns through his counsel who stated, "I would also indicate that all of the defendants in this case are now serving sentences so speedy trial concerns should not be dispositive in this case."

Hammond argues that he made comments indicating his desire for a speedy trial. However, the assertion of the right must be considered in light of its "frequency and force" in order to avoid "attaching significant weight to a purely *pro forma* objection." *Dickerson v. United States*, 650 A.2d 680, 685 (D.C.1994) (citation omitted). When Hammond first made a comment about the delay, it came over two years after the indictment. Even then, he did not request an immediate trial or use the words, "speedy trial." In context, comments made on Hammond's behalf appear to be a more generalized complaint about the delay rather than an emphatic and specific declaration of the right to be tried speedily. Hammond's clearest assertion of his speedy trial rights comes in his motion to dismiss on speedy trial grounds in 1995. However, even that assertion is weakened by his failure to move for an immediate trial in the alternative. *See Graves, supra*, 490 A.2d at 1098 (indicating that filing motion to dismiss or in the alternative to be tried immediately is the strongest way to assert the right). Absent such a request, his assertion is weakened and given less weight than it might have received otherwise.

### 4. Prejudice

■ Prejudice is assessed in light of the interests protected by the right to a speedy trial. *Graves, supra*, 490 A.2d at 1101. These include: "(1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired." *Id.* (citing *Barker, supra*, 407 U.S. at 532, 92 S.Ct. 2182). Hammond argues that he suffered each of these types of prejudice.

■ The government argues that Hammond was not prejudiced by pretrial incarceration because he was in jail on federal charges during most of the period of delay. "When, as here, a defendant is lawfully incarcerated for reasons not related to the pending charges and makes no credible showing that either his present or potential sentence will be substantially affected by the delay, ... there is simply no way the pretrial incarceration can be deemed oppressive." *United States v. Grimmond*, 137 F.3d 823, 830 (4th Cir. 1998) (citations omitted). Where a defendant is serving another sentence, the prejudice customarily arising from pre-trial incarceration is minimal. *Gaffney v.*

*United States*, 421 A.2d 924, 929 (D.C. 1980). Hammond claimed that he was housed in maximum security as a result of his incarceration. As the trial court observed in rejecting this claim, Hammond failed to provide any proof that his maximum security status was related to the charges pending in this case rather than the offenses for which he was serving a sentence of more than thirty years. Hammond's failure to make even a tenuous connection between his prison classification and his incarceration in this case leads us to reject his claim of prejudice resulting from pretrial incarceration. *See Grimmond*, 137 F.3d at 830.

▮ Hammond also claims prejudice based on the anxiety component of the analysis. To establish prejudice based on anxiety, "a defendant must do more than simply make an assertion but must show that 'the alleged anxiety and concern had a specific impact on [his] health or personal or business affairs.'" *Gayden, supra,* 584 A.2d at 585 (quoting *Graves, supra,* 490 A.2d at 1104). Hammond has not made such a specific claim. Moreover, the lengthy sentence he was serving and prior conviction minimizes his claim of anxiety. *See Graves*, 490 A.2d at 1104 (Prior experience with the criminal justice system tends to minimize the anxiety factor.).

Finally, Hammond argued that his defense was prejudiced because a witness, Troy Lewis, died. Hammond does not claim that Lewis was a witness to the murder or related offenses or that he could provide an alibi. He contends that Lewis went to a meeting where Michelle Watson gave Hammond's counsel a statement that did not implicate Hammond in the murder, and that he could have rebutted her expressed reason for giving the

statement.[16] Assuming that Lewis would have so testified, this is not the type of evidence the loss of which would constitute speedy trial prejudice. *See, e.g., United States v. Edwards*, 577 F.2d 883, 890–91 (5th Cir.1978) (finding corroborative evidence that may have affected the weight of the evidence insufficient to show prejudice constituting violation of speedy trial rights); *United States v. Scherer*, 523 F.2d 371, 378 (7th Cir.1975) ("Character witness testimony, while useful in establishing a defense, is not of the same magnitude as that which provides an absolute defense."); *United States v. Handel*, 464 F.2d 679, 681 (2d Cir.1972) (finding loss of deceased witness' testimony attacking credibility of government witnesses too minimal to overcome waiver of speedy trial rights). Given the substantial evidence available to impeach any exculpatory statement by Michelle Watson, the loss of Lewis' testimony was not likely to have had any significant impact on the trial.

### 5. Summary of Speedy Trial Analysis

#### (a) Hammond's Speedy Claim

▮ While the delay in this case was extremely lengthy, the reasons for the delay were overwhelmingly justified or neutral, with little delay that can be characterized as significant. Moreover, the charges were complex, involving multiple co-defendants in a murder conspiracy. "[T]he delay that can be tolerated for a serious and complex charge is considerably more than for a simple misdemeanor." *Warren v. United States*, 436 A.2d 821, 834 (D.C. 1981) (citation omitted); *see also Sell, supra,* 525 A.2d at 1020; *Parks v. United States*, 451 A.2d 591, 601 (D.C.1982) (finding that "serious charges and complex is-

---

**16.** There was evidence at trial that Michelle Watson gave the helpful statement merely because Hammond's counsel informed her that Hammond had nothing to do with Terry Pleasant's threat on her life.

sues" justified delay), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983). Hammond's delayed assertion of his speedy trial right in an effort to gain the advantage of having his co-defendant's case go first and his less than forceful demand minimizes the impact of the assertion of the right element in the equation. Finally, Hammond has not shown either prejudice or the type of anxiety that would balance in favor of dismissal of the charges against him on speedy trial grounds.

### (b) *Wright's Speedy Trial Claim*

 Wright adopted Hammond's speedy trial argument without elaboration. The government contends that Wright's general adoption of Hammond's argument is insufficient to raise the issue on appeal because he has proffered no arguments or facts in support of this fact-specific claim. *See* D.C.App. R. 28(a) (requiring appellant to provide facts and argument). *See also Ramos v. United States,* 569 A.2d 158, 162 n. 5 (D.C.1990) (issue was abandoned on appeal where the brief had no facts, no argument and "fail[ed] to suggest" the issue in question). Under our rule, a party "may adopt by reference a part of another's brief." D.C.App. R. 28(j). However, the ability of a party to adopt another parties' arguments by reference has limitations, among which "is that the arguments adopted must be readily transferable from the proponent's case to the adopter's case." *United States v. Elder,* 90 F.3d 1110, 1118 (6th Cir.1996).[17] Further, the speedy trial right is personal to the defendant. *United States v. McWilliams,* 82

U.S.App.D.C. 259, 263, 163 F.2d 695, 699 (1947) ("[T]he constitutional guaranty of a speedy trial is a personal right which is waived by the accused's failure to demand trial.") (citations omitted). The speedy trial inquiry is also fact-intensive. In this case, many of the facts that apply to Hammond do not necessarily apply to Wright. Although the length of the delay is the same for both defendants, Wright and Hammond asserted their speedy trial rights at different times as we have indicated above where readily ascertainable. In some instances, Wright was more dilatory than Hammond and was responsible for more delay and continuances. Finally, Wright has not provided evidence of any specific prejudice to his defense. Given these factual differences, Wright's adoption of the argument is insufficient to warrant relief. *See Elder,* 90 F.3d at 1118 ("[W]hen one appellant raises fact-specific issues, a motion to adopt appellant's argument, without more, is insufficient to raise the point of error as to the adopting co-appellant."). In any event, as the government argues, since Hammond's argument that Wright seeks to adopt fails on the merits, Wright's argument, particularly without the benefit of facts supporting any claim of prejudice to Wright, also fails.

### III. Denial of Severance

Both Hammond and Wright argue that the trial court erred in denying severance of their trials. Specifically, Hammond contends that he was prejudiced in their joint trial by disclosure of Wright's prior criminal convictions, by Wright's testimony

---

**17.** The Federal Rule of Appellate Procedure at issue in *Elder, supra,* is identical to the local rule on this point. *Compare* FED. R. APP. P. 28(i) ("In a case involving more than one appellant or appellee, including consolidated cases, any number of appellants or appellees may join in a brief, and any party may adopt by reference a part of another's brief. Parties may also join in reply briefs.") *with* D.C.App. R. 28(j) ("In cases involving more than one appellant or appellee, including cases consolidated for purposes of the appeal, any number of either may join in a single brief, and any appellant or appellee may adopt by reference any part of the brief of another. Parties may similarly join in reply briefs.").

that he did not "hang out with any decent people," and by testimony elicited by Wright's counsel from Kevin Watson that Hammond had threatened to kill every Watson on the face of the earth. Similarly, Wright argues that severance of his case was required because the statements of Hammond and Sweet were used to inculpate him. Further, Wright contends that he was precluded from offering evidence about Hammond's relationship with Sweet and Page and introducing evidence that Hammond had been previously convicted of murder.

### A. *Applicable Legal Principles*

 "There is a longstanding presumption that favors trying appellants jointly when they are charged with jointly committing a criminal offense." *Sterling v. United States,* 691 A.2d 126, 135 (D.C. 1997) (citations omitted). However, when it appears that prejudice will result from a joint trial, a defendant can move for severance pursuant to Super. Ct.Crim. R. 14. In evaluating severance motions under Rule 14, the trial court must balance throughout the trial "the possibility of prejudice to the defendant against the legitimate probative force of the evidence and the interest in judicial economy." *Crutchfield v. United States,* 779 A.2d 307, 322 (D.C.2001) (citations and internal alterations omitted). Once a severance motion is made, the trial court has a "continuing duty to take adequate measures to guard against unfair prejudice from joinder." *Carpenter v. United States,* 430 A.2d 496, 501 (D.C.1981) (en banc), *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981). The decision to sever cases is committed to the sound discretion of the trial court. *Bright v. United States,* 698 A.2d 450, 454 (D.C.1997) (citation omitted). This court will reverse the trial court's decision "only upon a clear showing that it has abused its considerable discretion."

*Sterling, supra,* 691 A.2d at 135 (citations omitted). "To demonstrate an abuse of discretion, a defendant must show not simply prejudice, but that [he or she] suffered manifest prejudice from the joinder of their cases." *Id.* (citations and internal alterations omitted). We consider each of appellants' claims in light of these general principles.

### B. *Hammond's Severance Claims*

 The trial court denied Hammond's pretrial motion to sever; however, his arguments on appeal relate to events that developed during the trial. Hammond argues that he was prejudiced by Wright's testimony to the effect that any people with whom he associated were not decent, particularly absent a limiting instruction. He also contends that he was prejudiced because Wright, who had testified on direct that he did not know Hammond, was impeached with prior convictions. He argues that the effect of Wright's testimony was to suggest to the jury that it should find him guilty because Wright was not credible and did not associate with decent people.

 The government argues that Hammond's claim must be reviewed for plain error because he did not renew his motion for severance during trial, made no objection to Hammond's characterization of his associates as indecent and did not request a limiting instruction. We agree that in these circumstances, we review for plain error. *See Hunter v. United States,* 606 A.2d 139, 144 (D.C.1992) (When the point is not preserved, on appeal, we review for plain error.). To reverse for plain error, the error must be " 'clear' or 'obvious,' " and "so serious that it jeopardized the fairness of the trial or caused a miscarriage of justice." *See Busey v. United States,* 747 A.2d 1153, 1167 (D.C.2000) (ci-

tations omitted). The requisites for finding plain error are not met here.

■■■ First, it does not appear that Wright, who claimed not to know Hammond, was referring to Hammond in characterizing his own associates as not being decent. Second, even assuming that the comment was sufficiently broad to include Hammond, as the government points out, the statement does not implicate Hammond in, or accuse him of any wrongdoing. Unfair prejudice requiring severance is not demonstrated merely by the attempt of co-defendants to blame each other. *Dancy v. United States*, 745 A.2d 259, 266 (D.C. 2000). Here, Wright's statement did not even seek to blame Hammond. At most, the statement suggested that Wright considered any associate of his, including Hammond, to be less than decent. We are not persuaded that Wright's testimony presented unfair prejudice requiring the trial court to intervene *sua sponte* and sever the trials.

Hammond argues that the case is governed by this court's holding in *Hordge v. United States*, 545 A.2d 1249 (D.C.1988). In *Hordge*, this court reversed the armed robbery conviction of Hordge's co-defendant, McBride, because the prosecutor's attack on Hordge's credibility had a negative effect on McBride's innocent presence defense. *Id.* at 1259. McBride, against whom the government proceeded on an aiding and abetting theory, had sought severance because Hordge was willing to provide exculpatory testimony for him. *Id.* at 1258 n. 5, 1259. This court concluded that "the prosecutor's use of Hordge's post-arrest statement to impeach his trial testimony exculpating McBride created a substantial risk that the jury would conclude that because Hordge was lying at

trial, McBride was guilty." *Id.* at 1259. McBride requested, but the trial court did not instruct the jury that Hordge's statement could not be used against McBride. *Id.* at 1258–59. Unable to conclude that the error was harmless under the standard set forth in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), we reversed McBride's conviction.[18]

Hammond's case is materially distinguishable from *Hordge, supra.* Wright, unlike Hordge, did not provide exculpatory testimony for Hammond. Moreover, the challenged remark does not relate to Hammond's role in the crime and did not impair Hammond's defense. Finally, a number of other factors that account for the reversal in *Hordge*, are not present in this case including: (1) the minimal evidence against McBride; (2) the trial court's refusal to give a cautionary instruction, after three requests, to explain that the impeachment evidence against Hordge could not be used as evidence of McBride's guilt; and (3) an evaluation of the impact of the error under the less stringent *Kotteakos* standard for preserved error.

Hammond also argues that the trial court should have severed the cases during the testimony of Kevin Watson. He refers to Watson's testimony in cross-examination by Wright's counsel during which Watson testified that he started cooperating with the police because "Tony" (Hammond) was talking about "killing ... every Watson that ever walked the face of this earth...." Hammond's counsel moved to sever and for a mistrial, which the trial court denied. Defense counsel then requested, and the trial court gave a cautionary instruction that Watson's statement should not be used in determining Ham-

---

**18.** Under *Kotteakos, supra,* the test is whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." 328 U.S. at 765, 66 S.Ct. 1239.

mond's guilt. The trial court properly instructed the jury that the statement could only be used as proof of Kevin Watson's state of mind, and not as proof of the guilt or innocence of Hammond.[19] This instruction was sufficient to cure any harm caused by the statement. *See McCullough v. United States*, 827 A.2d 48, 55 (D.C. 2003) (noting that "[i]t is well settled in this jurisdiction that jurors are presumed to follow instructions") (citation omitted). Moreover, there is no showing that Kevin Watson's account of Hammond's statement could not have been used in a separate trial as evidence of Hammond's consciousness of guilt. *See Payne v. United States*, 516 A.2d 484, 491 n. 14 (D.C.1986) (Evidence of the accused's threats to a prosecution witness is admissible as tending to show consciousness of guilt.). Therefore, there was no prejudice warranting severance based on Kevin Watson's testimony.

### C. *Wright's Severance Argument*

◼ Wright also argues that the trial court erred in denying his severance motion. He contends that severance was required under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because statements attributed to Sweet and to his non-testifying co-defendant, Hammond, purported to inculpate him.[20] In *Bruton*, the Supreme Court held that Bruton's confrontation rights were violated by admission of his non-testifying co-defendant's confession implicating Bruton in the crime charged. *Id.* at 128, 88 S.Ct. 1620. However, the Supreme Court noted that it did not have before it any question concerning whether the statement was admissible under any recognized exception to the hearsay rule. *Id.* at 128 n. 3, 88 S.Ct. 1620. "[I]f the statements satisfied a recognized hearsay exception based on the statements' presumed reliability, that reliability in turn would satisfy the concerns of the Confrontation Clause." *Akins v. United States*, 679 A.2d 1017, 1030 (D.C.1996) (citing *White v. Illinois*, 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (other citation omitted)). For the reasons discussed in Section V, *infra*, we conclude that Hammond's statements were sufficiently reliable to satisfy the Confrontation Clause. Therefore, we conclude that the trial court did not abuse its discretion in denying Wright's severance motion on *Bruton* grounds. *See, e.g., United States v. Gibson*, 409 F.3d 325, 337–38 (6th Cir.2005) (holding constitutionally admissible a non-testifying co-defendant's non-testimonial statement implicating the accused); *United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir.1994)

19. The trial court instructed the jury as follows:

> Ladies and gentlemen, on cross-examination you just heard the witness relate something about his state of mind and his own fears or concerns about possible retaliation. He mentioned the name Tony. You should understand that that last comment was simply related to his own thinking. There's no evidence that the Tony that's been described in this case, Mr. Hammond[,] or anyone else in fact tried to retaliate against him or his sister. But it's just limited to his own state of mind and the issue. So it shouldn't have any other use by you with respect to the guilt or innocence of Mr. Hammond.

20. Apparently, Wright refers to the testimony of: (1) Kevin and Michelle Watson that Sweet said in the presence of Pleasant and Hammond that he (Sweet) shot the man in the body and that Hammond said that he knew it had been done right when he saw Sweet and Wright; and (2) Michelle Watson's testimony that Hammond said that he saw Sweet, Wright and Terry Pleasant after the shooting. Wright does not identify the statements to which he refers in this section of his argument, although he references the statements in connection with his confrontation argument.

(denial of severance on *Bruton* grounds upheld where co-defendant's statement was properly admitted under FED. R. EVID. 804(b)(3) (hearsay exception for statements against interest)).

Wright also argues that he was prejudiced by the denial of severance because he could not introduce at his joint trial evidence that: (1) Sweet was a "hit man" for Hammond; (2) that Hammond and Page had previously worked together to commit murder; and (3) that Hammond had a prior conviction for murder. Assuming the admissibility of any or all of this evidence in a separate trial, its usefulness to Wright's defense at a separate trial is doubtful. The government contends that its theory would have been the same, *i.e.,* Hammond and Page were friends, and Hammond enlisted other friends, including Wright, to murder Richardson. Thus, it would seem that any evidence further buttressing Hammond's murderous activities would have bolstered the government's case at Wright's expense. Therefore, Wright has not shown prejudice from denial of severance on the basis of his loss of an opportunity to use this evidence.[21] The government argues that any harmful information about Hammond would only serve to *strengthen* the case against Wright. The government's theory was that Hammond was an unsavory character engaged in murder and that Wright associated with

him. Thus, the introduction of evidence about Hammond's actions, while harmful to Hammond, would have been equally harmful to Wright. Given the circumstances, we conclude that no manifest prejudice resulted from restricting Wright in this manner, and the trial court did not need to sever the trial.

## IV. Other Crimes Evidence

### A. *Admission of Bradley Sweet's Statement*

 Hammond argues that he was prejudiced by the testimony of Detective Rita McCoy–Brown that Bradley Sweet had stated that "he [Sweet] was a hit man" and that "he had done numerous murders." Hammond contends that this evidence was inadmissible other crimes evidence that gave the impression that Sweet, a self-described "hit man," was probably involved in killing Richardson, and this time it was at the behest of Hammond. He also contends that the evidence should have been excluded because the danger of unfair prejudice outweighed its probative value.[22] The government responds that Sweet's redacted statement did not implicate Hammond, and therefore, no "other crimes" evidence issue was raised with respect to Hammond. Further, the government contends that the plain error standard applies because Hammond objected

---

**21.** Whether this court would sanction the use of reverse *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964) evidence, to prove propensity to commit crimes is an issue we need not decide. *See Morris v. United States*, 622 A.2d 1116, 1126–27 (D.C.) (citing with approval trial court's failure to admit other crimes evidence of third person to show propensity, but deciding question on other grounds), *cert. denied*, 510 U.S. 899, 114 S.Ct. 270, 126 L.Ed.2d 221 (1993).

**22.** In *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that "where testimo-

nial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Thus, a non-testifying declarant's prior testimonial statements are inadmissible against a defendant unless the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine him or her. However, Hammond did not challenge at trial nor in this appeal the admissibility of Sweet's statement based on confrontation grounds. Therefore, we do not address whether the statement is testimonial and inadmissible on that basis.

to admission of the statement only on relevance grounds in the trial court.[23]

 Other crimes evidence is not admissible to prove the defendant's predisposition to commit a crime. *Drew, supra* note 21, 118 U.S.App. D.C. at 15–16, 331 F.2d at 89–90; *Johnson v. United States,* 683 A.2d 1087, 1092 (D.C.1996) (en banc) (stating "evidence of prior bad acts that are criminal in nature and independent of the crime charged" are inadmissible when offered to prove that the defendant is predisposed to commit a crime). Evidence of other crimes is admissible for "substantial, legitimate purpose[s]," including proof of motive, intent, absence of mistake, a common scheme or plan, and identity. *Id.* Regardless of whether the evidence falls within the strictures of the *Drew* rule, it cannot be admitted unless its probative value is substantially outweighed by its potential for unfair prejudice. *See id.* at 1098–99 & n. 12.

Here, Sweet's redacted statement does not implicate Hammond in any other crime; no act, crime or wrong by Hammond is involved. Therefore, an other crimes evidence issue in the *Drew* sense is not presented by the introduction of Sweet's redacted statement.[24] Hammond argues that even though he was not identified, the evidence can lead only to the conclusion that Sweet killed Richardson at Hammond's behest. In making this argument, Hammond exceeds the bounds of permissible inferences from the evidence actually presented. The *Drew* rule is intended to protect a criminal defendant from undue prejudice, *i.e.,* that the jury will infer that the accused committed the crime charged because of his or her commission of an uncharged crime. *See Drew, supra* note 21, 118 U.S.App. D.C. at 15–16, 331 F.2d at 89–90. The evidence of Sweet's involvement in a prior crime does not create an inference of propensity with respect to Hammond's character.

Hammond argues that the same danger of unfair prejudice that infected Sweet's trial as a result of Sweet's statement, which resulted in reversal of Sweet's conviction, is present in his case. We disagree. In *Sweet v. United States,* 756 A.2d 366 (D.C.2000), this court reversed Sweet's conviction because evidence that Sweet had committed uncharged contract killings was introduced in his murder trial.[25] In the *Sweet* case, the evidence that

---

**23.** In the unredacted statement, Sweet admitted having done "hits" for Hammond. The trial court (Judge Kollar–Kotelly) ruled pretrial that the redacted version omitting any reference to Hammond was admissible over Hammond's objection on the grounds of relevance. After the government's interlocutory appeal, the government sought admission of the statement, noting the prior judge's ruling that it was admissible. Hammond apparently agreed that this had been the ruling, and the trial court (Judge Cushenberry) admitted the statement.

**24.** *But see* WRIGHT & GRAHAM, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5239 (1978) ("In some conspiracy cases, the 'other' act that is proved is not that of the defendant himself but involves conduct of third persons. While [Federal] Rule [of Evidence] § 404(b) is not limit-

ed to other acts of the defendant, proof of conduct of third persons does not normally support a strong inference of the character of the accused himself."); 3 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 404.22(5)(b) ("Courts often give the prosecution especially broad leeway in the use of other-crimes evidence when a conspiracy has been charged .... Other crimes evidence may be admitted in a conspiracy prosecution to demonstrate the interaction between the participants in the conspiracy.").

**25.** Sweet was convicted of multiple offenses including, among others, conspiracy to commit first-degree murder while armed (premeditated), felony murder, obstruction of justice, assault with intent to commit obstruction of justice while armed and related weapons offenses in connection with the murder of

Hammond had solicited Sweet to commit the Richardson murder because Sweet had committed murders for Hammond before did not fall within any exception to *Drew,* was not necessary to prove the charged offense, and was improperly used, and had no other apparent purpose than to show predisposition. *Id.* at 374. In contrast, in Hammond's case, there was no evidence presented that Hammond had tried to solicit Sweet for the Richardson murder or that Sweet had ever committed a murder for Hammond.

The government argues that, although Sweet was not on trial in this case, his statement "was relevant evidence because it tended to corroborate the other evidence ... that Sweet was an active conspirator in the plot to kill Richardson." We need not accept or evaluate this claim to conclude that any prejudice to Hammond from admission of the statement was insufficient to warrant reversal, particularly in light of the ample other evidence of his guilt.

### B. *Wright's Other Crimes Evidence Arguments*

Wright argues that he was unduly prejudiced by the introduction of other crimes and bad acts evidence. Specifically, he refers to introduction of (1) his prior convictions, particularly those that post-dated the crimes charged, and (2) threats to witnesses in the case. He contends that this evidence tended to suggest that he had a predisposition to commit the charged crimes. These claims are unpersuasive for the reasons hereinafter stated.

### 1. *Prior Convictions*

■■■ Wright's prior convictions were used to impeach his credibility. Although he made no objection to their use, the trial court properly instructed the jury about their limited purpose.[26] This is, of course, a permissible use of prior convictions. *Fields v. United States,* 396 A.2d 522, 527 (D.C.1978) ("[O]nce the defendant testifies, his credibility may be impeached by reference to his prior convictions."). Wright seems to contend that his convictions postdating the crime can not be used for impeachment purposes. However, no such limitation is imposed by the statute authorizing the use of convictions for that purpose. *See* D.C.Code § 14–305 (1981); *see also Franklin v. United States,* 555 A.2d 1010, 1012 (D.C.1989) (interpreting conviction under D.C.Code § 14–305 to mean "a judgment of conviction based on a sentence") (citation omitted). Since the prior convictions can be used only to impeach the credibility of the defendant or other witnesses, the critical time of the impeachment offense is necessarily prior to the time of the witness' testimony in court, rather than the date of the offense for which defendant is on trial.

■■■■ Wright also argues that the government misused his prior CPWL conviction to infer that same gun was used in the crime charged. "A prior conviction may not be introduced by the prosecution to prove that the defendant is guilty of the crime with which he is charged." *Fields, supra,* 396 A.2d at 527. When the offense on trial is similar to the impeachment offense, the risk of misuse of the prior conviction is greatest. *Id.* "To minimize the

---

Ronald Richardson, the victim in the present case. *See Sweet, supra,* 756 A.2d at 368. He was charged, along with Hammond, Pleasant and Michael Page, in connection with Richardson's murder. *Id.* at 371.

**26.** The convictions used to impeach Wright were a 1992 North Carolina conviction for possession with intent to distribute cocaine; a 1992 North Carolina conviction for CPWL (9 mm pistol) and a 1990 conviction for destruction of property in the District of Columbia.

risk, the prosecutor must not impeach the defendant with prior convictions in a manner which suggests to the jury that because of his prior criminal acts, the defendant is guilty of the crimes charged." *Id.* (citations omitted). Our review of the record indicates that the prosecutor scrupulously observed these requirements and did not misuse Wright's convictions to suggest that the weapon in this case was related to the weapon that was the subject of Wright's CPWL conviction. The prosecutor simply elicited Wright's admission that he had been convicted of the three offenses after which the court instructed the jury on their limited use. The prosecutor mentioned the convictions in closing argument, but only for the jury's consideration in assessing Wright's credibility. Therefore, there was no error, and clearly no plain error, in the use of appellant's prior convictions nor any *Drew* violation associated with their use.

### 2. *Threats Evidence Challenged by Wright*

Wright also argues that he was prejudiced by other crimes evidence consisting of threats made by Hammond to the Watsons, the fear expressed by certain witnesses, and evidence that some witnesses were in the Witness Protection Program. He contends that this evidence was other crimes or bad acts evidence, precluded under the strictures of *Drew, supra,* and that it was irrelevant and improperly used to show predisposition to commit the crimes charged. The government responds that the challenged evidence was relevant and admissible.

▮▮▮ "The trial court's decisions about admission or exclusion of evidence are reviewed for abuse of discretion." *Plummer v. United States,* 813 A.2d 182, 188 (D.C.2002). To be admissible, *Drew* and non-*Drew* evidence must be relevant,

and its probative value must outweigh the danger of unfair prejudice. *Busey, supra,* 747 A.2d at 1165. The balancing of probative value versus prejudicial effect is committed to the trial court's discretion, and this court will reverse only for an abuse of discretion. *Id.* (citation omitted). " '[T]hreat evidence can be relevant to explain a witness' inconsistent statements, delay in testifying, or even courtroom demeanor indicating intimidation.' " *Foreman v. United States,* 792 A.2d 1043, 1049 (D.C.2002) (quoting *United States v. Thomas,* 86 F.3d 647, 653–54 (7th Cir. 1996)). The government contends that the evidence about which Wright complains falls within this category.

(a) *Witness Protection Program Evidence*

▮▮▮ Wright argues that he was prejudiced because both Eric Pleasant and Kevin Watson testified that they were in the Witness Protection Program. As the government points out, it was Wright's counsel who questioned Eric Pleasant about the program and the money he derived from it in excess of $85,000. On redirect, the prosecutor elicited from Wright, over Hammond's objection, that Eric Pleasant did not want to be in the program, but remained in it for his safety. This evidence was relevant and could be properly admitted to explain that the reasons for Eric Pleasant's participation in the program were other than financial, as defense counsel's questioning suggested, thereby opening the door to the prosecutor's inquiry. *See Foreman, supra,* 792 A.2d at 1050 (citing *Mercer v. United States,* 724 A.2d 1176, 1194 (D.C.1999) (Evidence of fear may be admitted where a defendant opens the door for its admission.)). The evidence was relevant to explain the witness' motivation for testifying, which was in question, and "if unexplained, could damage [the government's] case." *See id.* at 1049.

Kevin Watson's participation in the program was elicited without objection on cross-examination by Hammond's counsel. Since Wright did not object, we review for plain error. *See Smith v. United States,* 686 A.2d 537, 543 (D.C.1996) (citations omitted). Under that standard, reversal is warranted only "where the error complained of is so clearly prejudicial to the complainant's substantial rights as to jeopardize the very fairness and integrity of the trial." *Id.* at 543–44 (citations and internal quotation marks omitted). We cannot say that the court plainly erred in admitting this evidence. The participation of Kevin Watson and Eric Pleasant in the Witness Protection Program was not tied by the evidence to Wright.

(b) *Wright's Challenge to Hammond's Threats against Witnesses*

■■■■ Wright also contends that Hammond's threat to kill every Watson on the earth should have been excluded as bad acts evidence under *Drew, supra. Drew* does not apply to bad acts that constitute direct proof of the charged crime. *See Johnson, supra,* 683 A.2d at 1097. "Threats, bribery, flight, and similar post-crime conduct have repeatedly been held to evince consciousness of guilt and thus constitute admissions by conduct." *Burgess v. United States,* 786 A.2d 561, 569 (D.C.2001), *cert. denied,* 537 U.S. 854, 123 S.Ct. 210, 154 L.Ed.2d 88 (2002) (citations and internal quotations omitted). Hammond's threats fall within this category of evidence. The threats tend to show Hammond's consciousness of guilt or admissions of his involvement in the crime charged. *See id.* Therefore, Hammond's threat is direct evidence of the crime charged and does not violate the *Drew* rule.

(c) *Other Witnesses' Expression of Fear*

■■■■ Wright also claims prejudice resulting from the fears expressed by several witnesses. Specifically, Wright cites the following: (1) Michelle Watson's testimony "that she was afraid to tell the truth about when she last spoke with Michael Tinch for fear that he would be harmed"; (2) Terry Pleasant's order for, and then cancellation of, the killing of Michelle Watson; (3) the testimony of Kimberly Hayes, an eyewitness to the murder, that she did not go to the police because she feared for her life; and (4) Michelle Watson's expression of apprehension during her testimony in court. The government argues that this evidence was admissible to explain the witnesses' prior inconsistent statements, inconsistencies in testimony or demeanor on the witness stand. " '[T]hreat evidence can be relevant to explain a witness' inconsistent statements, delay in testifying, or even courtroom demeanor indicating intimidation.' " *Foreman, supra,* 792 A.2d at 1049 (quoting *Thomas, supra,* 86 F.3d at 653–54). The testimony complained of was properly admitted for these purposes. We consider each challenge in turn.

■■■■ First, Wright's counsel questioned Ms. Watson about inconsistencies in her testimony at trial and in prior statements concerning whether Tinch was present when Wright told her of his involvement in the murder. In an effort to explain the inconsistencies and the suggestion of recent fabrication, the prosecutor elicited Ms. Watson's explanation that she feared for Tinch's safety as a reason to explain her reluctance to reveal his knowledge of the incident or where he lived. "Evidence concerning the fear of a witness ... may be admissible when the witness has given conflicting statements." *Mercer, supra,* 724 A.2d at 1184.

Second, Terry Pleasant's letter to Eric Pleasant in which he called off the murder of Ms. Watson because he had learned

from "Tony's" lawyer that she did not give a statement to the government came into evidence during Eric Pleasant's testimony. The trial court admitted the letter as probative of Terry Pleasant's consciousness of guilt and participation in the conspiracy to murder Richardson, a legitimate purpose. *See Plummer, supra,* 813 A.2d at 188. The trial court instructed the jury that the evidence was admitted for that limited purpose and that it was *not* evidence that either Wright or Hammond participated in any plan to murder "Mick–Mick" [27] or committed the offense of conspiracy. During Ms. Watson's testimony, Terry Pleasant's letter came up again when the prosecutor questioned her about a statement she gave to Hammond's counsel with which she was impeached. The prosecutor inquired whether she knew about Terry Pleasant's letter and whether she learned of it before or after she signed a statement for defense counsel. Ms. Watson testified that she heard about the letter before she signed the statement.[28] The trial court again instructed the jury that there was no evidence that Wright or Hammond had anything to do with a threat to the witness, but the letter was admitted to show Ms. Watson's state of mind at the time she gave the statement.

The challenged evidence was probative of legitimate factual issues at trial. With respect to its presentation to Ms. Watson, the evidence was relevant to explain the facts and circumstances surrounding her providing a statement to one of the defense counsel which was used to impeach her trial testimony. *See Mercer, supra,* 724 A.2d at 1184, 1187 (Circumstances surrounding a prior statement properly admitted to rehabilitate witness after impeachment with the statement.). The trial court properly instructed the jury on the limited purpose for the evidence. Given the probative value of the evidence, the fact that it did not implicate Wright, and the trial court's careful instructions as to its limited purpose, no undue prejudice flowed from the admission of the evidence. *See id.* at 1190 (concluding that evidence of a witness' fear was not unduly prejudicial where relevant to explain witness' state of mind, did not implicate appellants and the jury was instructed properly on its limited purpose); *see also McCoy v. United States,* 760 A.2d 164, 186 (D.C.2000) (Jurors are presumed to follow the court's instructions.).

Third, Wright argues that he was prejudiced because Kimberly Hayes, an eyewitness to the murder, testified that she did not go to the police because she feared for her life. Wright did not object, therefore, we review this claim for plain error. *See Perkins v. United States,* 760 A.2d 604, 609 (D.C.2000). Appellant cannot meet that standard. The witness' expression of generalized fear, which did not implicate Wright, was not error, and clearly not plain error. *See id.* (Plain error requires a showing of an error that is "plain" or "obvious" and that "resulted in a clear miscarriage of justice.") (citations omitted).

Fourth, Wright argues that he was prejudiced because the prosecutor elicited from Michelle Watson testimony to explain her expression of apprehension consisting of concerns about her safety and that snitches sometimes "get killed" on the street. The trial court permitted this generalized testimony to explain Ms. Watson's behavior on the witness stand. Apparently, there was a woman in the courtroom at the time who appeared to be observing Ms.

---

27. Apparently, this is a reference to Michelle Watson.

28. Ms. Watson testified that Hammond's then counsel informed her that Hammond had nothing to do with Terry Pleasant's letter.

Watson's testimony and looking back at the defendants. At the same time, Ms. Watson appeared to become apprehensive. The trial court precluded the prosecutor from calling the jury's attention to the situation and eliciting that the person was connected in any way with appellants.[29] We find no error in the trial court's ruling permitting the limited inquiry. *See Foreman, supra,* 792 A.2d at 1049 (Threat evidence may be used to explain courtroom demeanor.). There was no focus on appellants, but rather a generalized expression of apprehension by the witness for reasons commonly known in the community.

## V. Confrontation/Declaration Against Penal Interest Arguments

Appellant Wright argues that the admission of various hearsay statements violated his rights under the Confrontation Clause of the Constitution. Specifically, he refers to: (1) Sweet's comments in the presence of Kevin and Michelle Watson that he (Sweet) "shot the bamma to the body," and Wright "shot him to the head"; and (2) Hammond's statement to Kevin and Michelle Watson that he (Hammond) was at the scene of the crime and that when he saw Sweet, he knew that the murder would "be done right." Wright argues that this evidence was admitted erroneously as declarations against penal interest or under the co-conspirator exception to the hearsay rule. He contends (and the government appears to agree) that these statements could not be admitted under the coconspirator exception because they were not made during the conspiracy, and that they were too untrustworthy to qualify as declaration against penal interest. The government responds that these statements were admitted properly as declarations against penal interest and that they

satisfied the trustworthiness standards set forth in applicable case law.

### A. *Applicable Legal Principles*

 The Sixth Amendment to the Constitution guarantees the right of the defendant "to be confronted with the witnesses against him." U.S. CONST. amend. VI. " 'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' " *Doret v. United States,* 765 A.2d 47, 62 (D.C.2000) (quoting *Lilly v. Virginia,* 527 U.S. 116, 123–24, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)) (in turn quoting *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)), *cert. denied,* 532 U.S. 1030, 121 S.Ct. 1980, 149 L.Ed.2d 772 (2001). The Supreme Court's decision in *Crawford, supra* note 22, 541 U.S. at 36, 124 S.Ct. 1354, altered prior Confrontation Clause jurisprudence for admissibility of hearsay statements in a criminal trial. Prior to *Crawford,* to satisfy the requirements of the Confrontation Clause, "the admissibility of all hearsay evidence [was conditioned] on whether [the evidence fell] under a 'firmly rooted hearsay exception' or [bore] 'particularized guarantees of trustworthiness.' " 541 U.S. at 60, 124 S.Ct. 1354 (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). *Crawford* abrogated *Roberts* by holding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68–69, 124 S.Ct. 1354. Thus, to meet Sixth Amendment requirements, the admissibility of

---

**29.** It was determined later, outside of the jury's presence, that the woman was Hammond's sister.

testimonial evidence is conditioned on "unavailability [of the witness] and a prior opportunity for cross-examination." *Id.* at 68, 124 S.Ct. 1354. While not defining comprehensively the meaning of "testimonial," the Supreme Court held that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id. Crawford* did not alter the application of *Roberts* to non-testimonial statements; therefore, we accept the continued viability of *Roberts* to such statements.[30] Post-*Crawford,* at least for non-testimonial hearsay, "[t]he Confrontation Clause is only violated by the admission of incriminating evidence under a hearsay exception that is neither firmly-rooted nor reliability-based." *Akins, supra,* 679 A.2d at 1030 (citing *Roberts,* 448 U.S. at 66 & n. 9, 100 S.Ct. 2531). Our inquiry then must be (1) are the hearsay statements testimonial, thereby precluding their admission, and (2) if not, do the statements fall within a firmly rooted exception to the hearsay rule or demonstrate particularized guarantees of trustworthiness. *See Roberts,* 448 U.S. at 66, 100 S.Ct. 2531.

■ The Confrontation Clause also protects a defendant's right to cross-examine witnesses, including "a co[-]defendant who has made out-of-court statements but declines to testify at trial." *Akins, supra,* 679 A.2d at 1028–29 (citing *Bruton, supra,* 391 U.S. at 128, 88 S.Ct. 1620). In *Bruton,*

the Supreme Court held that the admission of the confession of Bruton's non-testifying co-defendant violated Bruton's right to cross-examination under the Confrontation Clause and reversed his conviction where there was a substantial risk that the jury considered it in determining Bruton's guilt despite instructions to the contrary. 391 U.S. at 126, 88 S.Ct. 1620. The Supreme Court emphasized that the case was being decided under traditional rules of evidence and that it did not have before it any recognized exception to the hearsay rule. *Id.* at 128 n. 3, 88 S.Ct. 1620.

■ Declarations against penal interest are admissible as an exception to the hearsay rule. *See Laumer v. United States,* 409 A.2d 190, 199 (D.C.1979) (en banc); Fed. R. Evid. 804(b)(3).[31] "A statement tending to expose the declarant to criminal liability and offered as tending to exculpate the accused is admissible when the declarant is unavailable *and corroborating* circumstances clearly indicate the trustworthiness of the statement." *Laumer,* 409 A.2d at 199 (emphasis in the original). In *Laumer,* this court adopted the test set forth in Fed. R. Evid. 804(b)(3) to determine admissibility of declarations against interest as an exception to the hearsay rule. *Id.* This approach requires the trial court to determine: "(1) whether the declarant, in fact, made a statement; (2) whether the declarant is unavailable;

---

**30.** *See, e.g., Crawford, supra,* 541 U.S. at 57, 124 S.Ct. 1354 (citing *Dutton v. Evans,* 400 U.S. 74, 87–89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), for the principle that "reliability factors beyond prior opportunity for cross-examination [could be considered] when the hearsay statement at issue was not testimonial.").

**31.** Fed. R. Evid. 804(b)(3) provides for an exception to the hearsay rule as follows:

Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or

proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

and (3) whether corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.* Among the factors relevant in determining the trustworthiness of the declarations are: "(1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; [and] (3) the extent to which the declaration is really against the declarant's penal interest." *Id.* at 201 (quoting *Chambers v. Mississippi,* 410 U.S. 284, 300–01, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (other citation omitted)). Subsequently, this court held that the same approach should apply in considering the admissibility of statements tending to inculpate as well as exculpate defendants. *Lyons v. United States,* 514 A.2d 423, 428 (D.C.1986). This court recognized that the Supreme Court's opinion in *Williamson v. United States,* 512 U.S. 594; 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) "made it clear that non-self-inculpatory declarations are not admissible under Rule 804(b)(3)." *Hammond I, supra* note 8, 681 A.2d at 1144. However, since the question was left unanswered in *Williamson,* this court held in *Hammond I* that "*Williamson* does not require *automatic* exclusion of inculpatory references to a third party which are made within a broader self-inculpatory statement, . . . [although] such references are suspect at best." *Hammond I,* 681 A.2d at 1145 (emphasis in original). Upon review, we will not disturb the trial court's factual determinations related to the admission of such evidence unless clearly erroneous. *Doret, supra,* 765 A.2d at 61. "However, the trial court's conclusion that a statement is against the declarant's penal interest is clearly a legal question[,]" which this court reviews *de novo. Id.* at 62 (citation and internal quotations omitted). Applying these principles, we consider Wright's challenges to the declarations of Hammond and Sweet.

## B. *Analysis*

■ The statements that Wright challenges on confrontation grounds do not constitute testimonial statements within the meaning of *Crawford, supra.* 541 U.S. at 68, 124 S.Ct. 1354. The statements were not elicited during structured police interrogation or given by the declarant to any law enforcement officer. *See id.* at 53 & n. 4, 124 S.Ct. 1354 (Testimonial hearsay includes statements in response to police questioning.). A statement that is not made to the police with a possible view to prosecution is not "testimonial" within the meaning of *Crawford. Roy v. United States,* 871 A.2d 498, 505 (D.C.2005) (holding that admission of a statement to civilians, admitted in evidence under the present sense impression exception to the hearsay rule, does not violate confrontation rights as delineated in *Crawford*); *see also United States v. Saget,* 377 F.3d 223, 229 (2d Cir.2004) (holding that "a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*"). In this case, the statements that Wright challenges were made by either Wright himself and by other members of the conspiracy to close associates or co-conspirators, not to law enforcement officers. As such, they were not testimonial in nature. Therefore, we consider the propriety of their admissibility under *Roberts, supra,* 448 U.S. at 66, 100 S.Ct. 2531.

■ In this case, the trial court (Judge Cushenberry) first ruled admissible Wright's statement to Michelle Watson that "he shot the bamma . . . in the chest and head and Mr. Sweet shot him to the body." The court concluded that this statement was firmly rooted in an exception to the hearsay rule as a declaration against penal interest and was reliable,

and therefore presented no confrontation problems. In concluding that Wright's statement was reliable, the court reasoned that: (1) the statement was made by Wright to an associate in a drug conspiracy with no concern by the declarant that Ms. Watson had any motive or incentive to tell the police or to curry their favor; (2) the statement was "powerfully incriminating against the speaker"; and (3) the declarant did not seek to minimize his own involvement in the offense. Next, the trial court ruled admissible Sweet's statement to the same effect (*i.e.*, that he shot the "bamma" to the body, emptying his gun, and Wright shot him to the head). The trial court recognized that a *Williamson* type issue was presented with respect to this statement. *See Williamson, supra,* 512 U.S. at 601, 114 S.Ct. 2431 (related to inculpatory references to third parties). The court admitted the statement, having considered: (1) that it exposed Sweet to liability for first-degree murder; (2) that it was made to a close associate, who was also in the drug trade, and who had no connection with the police and no reason to share the statement with them; and (3) that the statement was virtually identical to Wright's statement, thereby tending to demonstrate its reliability and trustworthiness. The court also ruled admissible Hammond's statement to Kevin and Michelle Watson that he went to the crime scene where he saw Wright and Pleasant and that he knew that it (the murder) would be done right when he saw Sweet. The trial court again was persuaded, considering the context and content, that this statement was a declaration against penal interest and was reliable, particularly in that it was corroborated by Wright's own admissions. The trial court stated in response to Hammond's counsel's challenge to relying on the "symmetry" of statements as a basis for finding reliability that it had articulated other reasons for its ruling based on the totality of the circumstances and the context and content of the statements.

Wright argues that the statements of Sweet and Hammond to the Watsons should not have been admitted as declarations against penal interest because they were not made in furtherance of the conspiracy. However, as the government points out, that is not a required element for admission under the declaration against penal interest exception to the hearsay rule. Rather, the question is whether the statement falls within a firmly-rooted exception to the hearsay rule and whether it meets the reliability standard. *See Akins, supra,* 679 A.2d at 1030. That standard requires the trial court to determine: (1) whether the declarant made the statement; (2) whether the declarant is unavailable; and (3) whether corroborating circumstances clearly indicate the trustworthiness of the statement. *Laumer, supra,* 409 A.2d at 199. Wright argues for the first time on appeal that the trial court erred in failing to inquire into whether the statements were in fact made. Since Wright did not raise this issue in the trial court, we review this particular challenge for plain error.[32]

In evaluating whether a statement was in fact made

> the trial court's focus is not on the truth of the declaration, but on the veracity of the witness who repeats the declaration. Since the testimony of the witness may often be the only evidence that the

---

32. The record indicates that the only time Wright raised an issue regarding whether a statement was made was in reference to Terry Pleasant's statement that "we got one around your way." That issue was raised because there was contradictory evidence in the form of a police report showing that the "we" was not initially included in the statement.

statement was made, the trial court must necessarily determine that the witness was in a position to hear the statement. Where appropriate, the trial court must also assess the general credibility of the witness and probe for interest, bias, and the possible motive for fabrication. Some witnesses will no doubt display a high degree of credibility, leaving little doubt that the declaration was in fact made. *See, e.g., DeBinder v. United States,* 112 U.S.App.D.C. 343, 344, 303 F.2d 203, 204 (1962) (mother repeated confession made by son); *Thomas v. State,* 186 Md. 446, 447–48, 47 A.2d 43, 46 (1946) (police officer would be allowed to testify as to the inculpatory statement made by the declarant during the course of police investigation).

*Id.*

Wright's belated argument is unpersuasive. Although the trial court did not make a specific finding that the statements were made, that finding is implicit in its ruling. *See Daye v. United States,* 733 A.2d 321, 329 n. 8 (D.C.1999) (trial court's language and decision to admit evidence indicated an implicit finding that the requirements for admission of a co-conspirator statement were met) (citations omitted). Here, the trial court's ruling, summarized above, reflects its implicit finding that the statements were made before it proceeded to consider their trustworthiness. *See Laumer,* 409 A.2d at 199 (If the trial court concludes that the statements were not made, there is no basis for

further inquiry.). It is true that *Laumer* indicates that "[w]here appropriate, the trial court must also assess the general credibility of the witness and probe for interest, bias, and the possible motive for fabrication." *Id.* Here, the trial court did consider these factors. Absent a challenge to the making of the statement or a request for some further inquiry related to the issue, we cannot say that the trial court's inquiry was inadequate. Under a plain error review standard, Wright's argument fails on this record. Wright has not identified considerations, beyond those known to the trial court, that a more intensive inquiry would have revealed that the statements were not made.[33]

Since it is undisputed that Sweet and Hammond were unavailable, the question is whether the corroborating circumstances clearly indicate the trustworthiness of their declarations. Again, the factors to consider in evaluating the reliability of the statement include: "(1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; and (3) the extent to which the declaration is really against the declarant's penal interest." *Laumer, supra,* 409 A.2d at 200 (citations omitted). The government cites a number of factors that combine to show the trustworthiness of Sweet's declaration that he shot Richardson in the body and Wright shot him in the head, of Hammond's declarations that the murder was his work and that he saw Terry Pleasant, Sweet, and Wright "come

---

**33.** Wright urges this court to find that no statement was made primarily because (1) the Watsons had an opportunity to "get their stories together" and (2) Eric Pleasant and the Watsons were witnesses with government-granted immunity and protection. Both factors were known to the trial court when it made its ruling. Neither factor in itself is sufficient to overturn the trial court's implicit

finding that a statement was made. Put another way, there is no *per se* rule that the testimony of an immunized witness or one in the Witness Protection Program is so inherently incredible or unreliable that the trial court's implicit finding that the statement was made must be overturned on appeal even absent a challenge in the trial court.

over the hill" toward Richardson's house. Among these are that: (1) Sweet's declaration came one day after the murder, and Hammond's declaration was made two days after it; (2) Sweet's declaration was made in the company of Hammond, Terry Pleasant and Kevin and Michelle Watson, co-conspirators and close associates, none of whom had a relationship to the police at the time, and Hammond's declaration was made to the Watsons, his close associates, whom he apparently trusted; (3) both men's declarations were highly incriminating of a murder charge;[34] (4) there was evidence corroborating Sweet's declaration, including Wright's admission to the Watsons, the medical examiner's report describing three head shots and multiple body shots, and ballistic information showing one shell casing close to the victim's head and other casings further from his body; (5) the testimony of Loncene Wright placing three men at the scene of the crime tended to corroborate Hammond's declaration that Terry Pleasant, Sweet and Wright were there; (6) Kevin Watson testified that he heard Wright prior to the murder discussing giving someone "all head shots"; and (7) Dawn Brown, a child witness, testified that Wright said he "did that" to the corrections officer. Considering all of these circumstances related to the factors relevant to admissibility, we hold that the trial court did not err in concluding that the declarations were trustworthy, reliable and against the declarant's penal interest.[35]

## VI. Wright's Remaining Claims

### A. Sufficiency of the Evidence

Wright argues that the evidence was insufficient to convict him. Viewing the evidence in the light most favorable to the government, as we must, and recognizing the province of the jury to draw reasonable inferences from the evidence and determine questions of credibility, we conclude that the evidence was sufficient to support Wright's convictions of the offenses. See Nowlin v. United States, 782 A.2d 288, 291 (D.C.2001) (setting forth this standard of review for claims of evidentiary insufficiency) (citations omitted).

First, Wright argues that the evidence was insufficient to support his conviction of possession of a firearm during the commission of a dangerous offense. Wright admitted shooting Richardson in the head while Sweet shot him in the body. The ballistic evidence corroborated Wright's statement as did Sweet's statement. The jury could infer from this evi-

---

**34.** Hammond's claim that the murder was his work does not seek to shift the blame to others. Further, his declaration placing Wright at the scene also places Hammond there and implicates him in the larger conspiracy. See United States v. Westmoreland, 240 F.3d 618, 627 (7th Cir.2001) ("[A] statement that implicates the declarant in a larger conspiracy tends to subject the declarant to criminal liability and thus is a statement against interest."); United States v. Tocco, 200 F.3d 401, 415 (6th Cir.2000) (Statements linking declarant to the other conspirators were against his penal interest.).

**35.** Wright also argues that the trial court erred in precluding Eric Foster from testifying about hearsay statements attributed to Sweet and Terry Pleasant, whom Foster testified that he saw on the morning of the murder. While Wright argues that this evidence was admissible as a declaration against interest, he does not outline the nature of the evidence in his brief. In any event, at trial, when the court sustained objections to Wright's efforts to elicit hearsay statements from Foster, Wright did not argue their admissibility under any exception to the hearsay rule. Instead, he instructed the witness not to repeat the out-of-court statement. Therefore, we find no error in the trial court's ruling excluding this evidence.

dence that Wright possessed and used a firearm in connection with Richardson's murder.

▆ Second, Wright contends that there was no non-hearsay evidence supporting his conspiracy convictions. Wright seems to confuse the standard for determining the sufficiency of the evidence for convictions with the standard for admission of a co-conspirator's out-of-court assertions as non-hearsay evidence. *See Butler v. United States*, 481 A.2d 431, 439 (D.C.1984), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985).[36] For sufficiency purposes, once the evidence is properly admitted, the evidence must then be sufficient to prove beyond a reasonable doubt that "two or more persons conspir[ed] to commit a criminal offense[ ] and that one of the conspirators committed an overt act pursuant to the conspiracy to effect its purpose." *Jones v. United States*, 386 A.2d 308, 314 (D.C.1978) (citing D.C.Code § 22–105a (1981)),[37] *cert. denied*, 444 U.S. 925, 100 S.Ct. 263, 62 L.Ed.2d 181 (1979). There is no requirement that the conviction itself be based *only* upon non-hearsay evidence. *See Bellanger v. United States*, 548 A.2d 501, 502–03 (D.C.1988) (distinguishing conviction for conspiracy under D.C.Code § 22–105 (1981) from admissibility of co-conspirator statements under FED. R. EVID. 801(d)(2)(E)).[38]

▆ In order to obtain a conviction for obstruction of justice, the government must prove that Wright: (1) knowingly; (2) used intimidating or physical force, threats or corrupt persuasion; (3) to influence, intimidate, or impede a witness or officer in any official proceeding; (4) with intent to influence, delay, or prevent the truthful testimony of the person in an official proceeding. *See* D.C.Code § 22–722. Wright contends that his obstruction of justice conviction must be vacated as there is no proof that he had the requisite intent to commit the offense. Viewing the evidence in the light most favorable to the government, there was circumstantial evidence from which Wright's knowledge and intent to murder Richardson to prevent his testimony at Page's trial could be inferred.

---

**36.** This court has adopted FED. R. EVID. 801(d)(2)(E) non-hearsay assertion of a co-conspirator to be admitted "if the prosecution proves that (1) a conspiracy existed, (2) the defendant had a connection with the conspiracy, and (3) the coconspirator made the statements during the course of and in furtherance of the conspiracy." *Butler*, 481 A.2d at 439 (citation omitted). The court may consider only non-hearsay evidence in that admissibility determination. *Id.* at 440 (citations omitted).

**37.** Recodified at D.C.Code § 22–1805(1) (2001).

**38.** In *Butler, supra,* this court stated that prior to admitting statements by co-conspirators, the court must find that there is non-hearsay evidence establishing that: "(1) a conspiracy existed, (2) the defendant had a connection with the conspiracy, and (3) the coconspirator made the statements during the course of and in furtherance of the conspiracy." 481 A.2d at 439. In the present case, Wright does not

challenge either the existence of the conspiracy or the existence of the statements. Rather, he simply claims that there was no non-hearsay evidence connecting him with the conspiracy. In fact, the evidence established that Wright had a long term relationship with the other defendants and attended a meeting at Terry Pleasant's house right before the murder. Additionally, Loncene Wright placed three men at the scene of the murder. Statements have been admitted without direct evidence where there is circumstantial evidence of the conspiracy. *See Chavarria v. United States*, 505 A.2d 59, 62–63 (D.C.1986) (admitting co-conspirator statement despite lack of direct evidence of the conspiracy because "circumstantial evidence of a conspiracy was strong"). In this case, the evidence is stronger than that offered in *Butler*, where the only evidence of conspiracy was the fact that a second co-defendant visited Butler while in jail. *See Butler*, 481 A.2d at 440.

In determining evidentiary sufficiency, no distinction is made between direct and circumstantial evidence. *See Guzman v. United States*, 821 A.2d 895, 897 (D.C. 2003). This evidence included that in the days before the murder Wright was present during two conversations among Wright, Terry Pleasant and Sweet when they talked about a plan to kill someone. Terry Pleasant relayed to Hammond information concerning Richardson's address and license plate number and later said that the murder was committed for Page. Richardson was murdered on the morning of Page's trial as he left for court. The timing of the murder, which Wright admitted committing, along with the other evidence, permits a reasonable inference that Wright specifically intended to prevent Richardson from testifying at Page's trial. Therefore, we conclude that the evidence was sufficient to sustain the conviction.[39]

Wright's argument that the evidence was insufficient to support his conviction of conspiracy to commit first-degree murder while armed proceeds along the same lines. For essentially the same reasons, we conclude that the evidence, both direct and circumstantial, was sufficient to prove that Wright conspired with his associates to commit the murder of Richardson and that he committed the ultimate overt act of shooting Richardson to effect the purpose of the conspiracy. *See Jones, supra*, 386 A.2d at 314 (setting forth elements of proof required).

### B. *Claim of Due Process Violation*

▮▮▮ Wright argues that it was an abuse of prosecutorial authority to claim at his trial that he shot Richardson in the head, while arguing at Terry Pleasant's

trial that it was Pleasant who shot Richardson in the head. The government responds that there was no due process violation here because the same evidence was presented at both trials, and the prosecutor acknowledged and explained the inconsistent eyewitness accounts of Richardson's murder placing both Terry Pleasant and Wright at the scene of the crime and implicating both men.

Although this court has not addressed this issue, other courts have held that where multiple defendants are tried separately, the due process clause is violated where the prosecution presents inconsistent theories at their trials. *See, e.g., Smith v. Groose*, 205 F.3d 1045,1052 (8th Cir.2000) (holding that "the use of inherently factually contradictory theories violates the principles of due process"); *Thompson v. Calderon*, 120 F.3d 1045, 1059 (9th Cir.1997), *rev'd on other grounds sub nom., Calderon v. Thompson*, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) ("[I]t is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime."). In *Smith*, the prosecutor used a witness's statement to secure Smith's conviction and used a different statement of that same witness on a critical issue in order to secure the conviction of another defendant in a separate trial. 205 F.3d at 1051. "In short, what the State claimed to be true in Smith's case it rejected in [the co-defendant's] case, and vice versa." *Id.* at 1050. The Eighth Circuit reversed Smith's conviction, holding that "this manipulation of evidence deprived [Smith] of

---

**39.** The trial court did not enter judgment or impose sentence on this particular count, concluding that it would merge with the felony-murder conviction. We address the sufficien-cy claim nevertheless because the trial court will have to consider further how to handle the merged offense on remand.

due process and rendered his trial fundamentally unfair." *Id.* at 1051–52.

Wright's argument is based on the testimony of Kimberly Hayes, an eyewitness to the murder, that she saw only two men at the scene of the murder and that Terry Pleasant was the one who shot Richardson in the head. The government argues that there was no factual inconsistency because Hayes' testimony to that effect and Wright's declarations that it was he who shot Richardson were presented at both trials. At Terry Pleasant's trial, the government acknowledged that Hayes might have been mistaken when she identified him as one of the shooters, but that Pleasant, who was at the scene, was guilty at least as an aider and abettor. At Wright's trial, the prosecutor explained that Hayes might have been mistaken and confused the driver of the burgundy Dodge Caravan, Terry Pleasant's vehicle, upon whom Hayes focused as she was leaving. The prosecutor explained that Hayes could not identify the second man she saw and that she did not see the third man who was there.

We agree that the government's theories were factually reconcilable in this case. It is "the use of inherently factually contradictory theories [that] violates the principles of due process." *Smith,* 205 F.3d at 1052; *see also United States v. Paul,* 217 F.3d 989, 998 (8th Cir.2000) (prosecutorial theories that are based on "factually inconsistent and irreconcilable evidence" are not permitted). Here, the theories were not contradictory. The government presented evidence that Terry Pleasant, Sweet, and Wright were co-conspirators in Richardson's murder and that all three were present at the scene of the murder. The fact that Hayes identified Terry Pleasant as a shooter did not preclude a finding that Wright had also shot Richardson, as the evidence showed Wright twice asserted. Both Terry Pleasant and Wright could have been guilty of Richardson's murder under the theories presented by the government. *See Bradshaw v. Stumpf,* —— U.S. ——, 125 S.Ct. 2398, 2407–08, 162 L.Ed.2d 143 (2005) (holding that where the identity of the triggerman was immaterial to petitioner's conviction for aggravated murder, the Court of Appeals erred in holding that prosecutorial inconsistencies between petitioner's case and a second man involved required voiding petitioner's guilty plea).[40] *See Nguyen v. Lindsey,* 232 F.3d 1236, 1240 (9th Cir.2000) (finding no inconsistency in the prosecutor's position at separate trials of two defendants where both "could be guilty of the same crime because of the nature of the crime—the murder of an innocent bystander during gang warfare").[41] In the circumstances

---

**40.** In *Bradshaw,* petitioner, Stumpf, and another man, Wesley, carried guns to the home of Mr. and Mrs. Stout, intending to commit an armed robbery. 125 S.Ct. at 2402. Stumpf admitted that he shot Mr. Stout, but denied that he shot Mrs. Stout. *Id.* at 2403. Stumpf argued that the prosecutor has asserted inconsistent theories regarding who actually shot Mrs. Stout. The Supreme Court stated that the precise identity of the triggerman was immaterial to Stumpf's conviction of the aggravated murder of Mrs. Stout because both men could be found guilty of the crime under Ohio law, either as the shooter or as an aider and abettor. *Id.* at 2406. Therefore, the Supreme Court held that "[t]he Court of

Appeals was wrong to hold that prosecutorial inconsistencies between the Stumpf and Wesley cases required voiding Stumpf's guilty plea." *Id.* at 2407. However, the Supreme Court held that inconsistent theories might have a more direct effect in the sentencing phase of Stumpf's case and remanded it for consideration of whether the prosecutor's action amounted to a prejudicial due process violation in connection with Stumpf's sentencing. *Id.* at 2407–08.

**41.** In *Nguyen, supra,* the Ninth Circuit affirmed a conviction although the prosecution had used inconsistent arguments at each trial. 232 F.3d at 1240–41. The court noted that

presented in this case, we conclude that the prosecutor's theory was not so inconsistent as to violate Wright's due process rights.

### C. Merger of Offenses

 Wright argues that all of the offenses for which he was convicted merge as "one continuing offense." The government concedes that the following offenses merge: "the assault conviction merges with both murder convictions; the two murder convictions merge; and, if the felony-murder conviction is not vacated, the predicate obstruction conviction merges with it." We agree. *See Bailey v. United States*, 831 A.2d 973, 987–88 (D.C.2003) (Felony murder and premeditated murder merge, and felony murder and the underlying felony merge) (citations omitted); *see also Norris v. United States*, 585 A.2d 1372, 1374 (D.C.1991) ("[A]ssault with a dangerous weapon is a lesser-included offense of armed robbery because all of the elements of assault with a dangerous weapon are included in armed robbery."). Absent very special circumstances, "the conspiracy to commit an offense and the subsequent commission of that crime normally do not merge into a single punishable act. The essential element of conspiracy is the agreement to commit an unlawful act, which distinguishes it from other substantive offenses." *Pearsall v. United States*, 812 A.2d 953, 961 (D.C.2002) (citing *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975)). Since none of the foregoing offenses require proof of an agreement to commit crime, the conspiracy counts do not merge.

Wright does not specify the offenses that he contends merge with PFCV; however, it appears that he may refer to all offenses for which there was a "while armed" element. This court has previously decided that PFCV does not merge with any "while armed" count. *See Hanna v. United States*, 666 A.2d 845, 856 (D.C.1995) ("In *Thomas v. United States*, 602 A.2d 647, 650 (D.C.1992), we held that the Council of the District of Columbia did not intend for the offense defined by [D.C.Code § 22–] 3204(b) [PFCV] to merge with an offense subject to the enhanced penalty provision of [D.C.Code § 22–] 3202 for committing an underlying offense while armed") (citation and internal quotations omitted).

### D. Improper Argument

 Wright argues that the prosecutor engaged in improper closing argument by suggesting that Wright's counsel was attempting to elicit the names and addresses of witnesses to assist the defendants' efforts to harm the witnesses. The prosecutor is not allowed to make negative comments about the defense counsel in closing argument. *See Irick v. United States*, 565 A.2d 26, 34 (D.C.1989) ("*Ad hominem* attacks against opposing counsel are uncalled for and unprofessional."). However, the court should not assign the most sinister possible meaning to the prosecutor's statements. *See Lee v. United States*, 668 A.2d 822, 831 (D.C.1995). In the present case, it is clear that the references to the questions at issue were intended to point out that Michelle Watson lied about Michael Tinch's whereabouts,

---

although the positions taken by the prosecutor were inconsistent, there was no error because "both defendants could be guilty of the same crime because of the nature of the crime—the murder of an innocent bystander during gang warfare." *Id.* at 1240. *See also Paul, supra,* 217 F.3d at 998 ("When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent [in violation of due process].").

not to prevent his testimony, but to protect him from Hammond and others. That this was the reason for the prosecutor's comments is underscored by the fact that his presentation on this point ended with "You judge for yourselves if that affects the quality of her testimony in your judgment."

■ Wright's related claim that the prosecutor referred to the threats evidence throughout the trial in order to inflame the jury is equally unpersuasive. Prosecutors are prohibited from making statements that "attempt to appeal to the jurors' sympathies." *Carpenter v. United States*, 635 A.2d 1289, 1296 (D.C.1993). However, in the present case, the evidence of the fear witnesses felt and threats that they had received were not adduced to inflame the jury. Rather, as the government points out, the evidence was relevant to show why Michelle Watson changed her story, and why she appeared shaken on the stand. The Witness Protection Program information was also relevant to refuting claims of bias. Therefore, we reject Wright's claims of improper argument.

For all of the foregoing reasons, we affirm appellants' convictions. We remand to the trial court with instructions to vacate the merged offenses consistent with this opinion and for consideration of Wright's unresolved motion filed pursuant to D.C.Code § 23–110.[42]

*So ordered.*

## APPENDIX
### SPEEDY TRIAL SUMMARY

| Period | Reason | Weight | Quantity |
| --- | --- | --- | --- |
| June 29, 1992 to October 29, 1992 | institutional delay | neutral - | four months |
| October 30, 1992 to November 23, 1993 | delay by both parties | neutral | thirteen months |
| November 23, 1993 to May 9, 1994 | delay by both parties | neutral + | five months and one week |
| May 9, 1994 to October 17, 1994 | prosecutor's conflict & defense unavailability | significant / neutral - | one month / approx. 5 months |
| October 17, 1994 to October 24, 1994 | prosecutorial unpreparedness | significant | one week |
| October 24, 1994 | prosecutor's illness | justified | one day |
| October 25, 1994 to September 26, 1996 | interlocutory appeal | justified except where noted below | twenty-three months |
| March 16, 1995 to September 5, 1995 | interlocutory appeal; parties' delay during appeal | neutral + | five and one-half months |
| September 25, 1995 to October 16, 1995 | interlocutory appeal; parties' delay during appeal | neutral + | twenty-one days |

**42.** Wright makes references in his brief to claims of ineffective assistance of trial counsel and attaches a copy of an unresolved motion to set aside his sentence pursuant to D.C.Code § 23–110. Since the motion is still pending in the trial court, we do not address these claims. The trial court should address the motion in the first instance.

| March 11, 1996 to April 5, 1996 | interlocutory appeal; parties' delay during appeal | neutral + | twenty-four days |
|---|---|---|---|
| September 26, 1996 to January 6, 1997 | remand and scheduling; plea bargaining | neutral | three and one-half months |